# IN THE SUPREME COURT OF IOWA

No. 17–1286

Filed March 22, 2019

**STATE OF IOWA,**

Appellee,

vs.

**CHARLES RAYMOND ALBRIGHT,**

Appellant.

---

Appeal from the Iowa District Court for Franklin County, Gregg R. Rosenbladt, Judge.

A defendant appeals his convictions and sentences for willful injury causing bodily injury and kidnapping in the first degree. **JUDGMENT OF CONVICTIONS AFFIRMED; SENTENCES AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

Mark C. Smith, State Appellate Defender, and Martha J. Lucey, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Martha E. Trout and Laura Roan, Assistant Attorneys General, and Brent Symens, County Attorney, for appellee.

**WIGGINS, Justice.**

A defendant appeals his convictions and sentences for willful injury causing bodily injury and kidnapping in the first degree. He claims that there was insufficient evidence to support his kidnapping conviction and that he was prejudiced when the court instructed the jury on a lessor included charge of kidnapping in the second degree. He also claims his trial counsel was ineffective by failing to object to and by introducing evidence of his other crimes, wrongs, or other acts. Finally, he claims the district court erred in ordering him to pay restitution without first considering his reasonable ability to pay.

On appeal, we find that substantial evidence supported his conviction for first-degree kidnapping and that he was not prejudiced when the court instructed the jury on a lessor included charge of kidnapping in the second degree. We also find we cannot reach his ineffective-assistance-of-counsel claims regarding his counsel's failure to object to and introduction of evidence of his other crimes, wrongs, or other acts on direct appeal. We further find the restitution prescribed in the sentencing order does not comply with our restitution statutes. Therefore, we affirm Albright's convictions for willful injury causing bodily injury and kidnapping in the first degree. We vacate the restitution part of the sentencing order and remand the case to the district court to order restitution in a manner consistent with this opinion.

## I. Background Facts.

"Viewing the trial evidence in the light most favorable to the jury's guilty verdict[], the jury could have found the following facts." *State v. Romer*, 832 N.W.2d 169, 172–73 (Iowa 2013). The defendant, Charles Albright, and K.H. dated for over two years, during which time they lived

together in various locations around Iowa. In October of 2016, Albright and K.H. lived in a house in Meservey.

Around 1:30 a.m. on October 7, 2016, Albright became paranoid after using methamphetamine and decided not to go into work that day. Albright accused K.H. of having men over to their home while he was at work and said he was going to stay home to keep an eye on K.H. K.H. told Albright she was not having men over while he was at work. At that point, Albright became very angry and hit K.H. Albright continued to hit her in the face with both an open hand and a fist while accusing her of lying and calling her worthless, good-for-nothing, and other derogatory names.

K.H. tried to get away from Albright. As she went toward the locked door of their home, Albright grabbed K.H. by the collar of her jacket, threw her against the wall, and told her she was not leaving the house. Albright then threw K.H. onto the floor and slammed her head into the ground twice. Albright continued to hit K.H. as he threw her onto the mattress in the living room. Albright's dog, who lived with the couple, began biting K.H. on the leg and on the hip while Albright continued to batter K.H. on the mattress.

Albright hit K.H. in her pelvic region multiple times with the backside of a cordless drill. K.H. tried to block Albright's blows to her face and body with her hands and arms. Albright held K.H. down and cut behind her ear with a knife. He used a Taser to burn K.H.'s wrists. The assault went on intermittently for hours.

K.H. could not escape because she was scared and Albright was always watching her. When she tried to leave the home by moving toward the door, Albright blocked the door and told K.H. to sit back down. K.H. had to remain within Albright's eyesight the entire morning, and Albright never fell asleep.

That afternoon, Albright forced K.H. to go with him to the veterinarian in Sheffield. K.H. did not want to enter Albright's truck with him because she was afraid he would kill her. She told Albright she did not want to go. Albright started getting out of the truck to force her physically inside, so K.H. entered Albright's vehicle.

On the way to the veterinarian's office, Albright continued to hit K.H. Albright made a phone call to a friend, and K.H. tried to call out "help" to the friend on the phone. Albright told K.H. he was going to bury her in a cornfield up to her neck and let a combine cut off her head.

When Albright and K.H. arrived at the veterinarian's office, K.H. stayed in the truck while Albright took the dog inside. K.H. did not try to escape from the truck while Albright was inside the veterinarian's office because there was a large window looking out from the office to the parking lot, and she was afraid Albright would see her escape from the truck.

After the veterinarian appointment, Albright drove to a Casey's gas station. While Albright was inside the gas station, K.H. escaped by leaving Albright's truck and running across the road to Dollar General. Once inside, K.H. asked the Dollar General clerk for a telephone and the keys to the restroom. K.H. called 911 for help from inside the restroom and waited there until an officer arrived.

The Sheffield Chief of Police arrived at Dollar General at approximately 3:00 p.m. as the first officer on the scene. K.H. sounded very scared when he arrived, and she wanted to verify it was the officer outside the restroom door, not Albright. When K.H. opened the door for the officer and he first saw her, K.H. was propped up against the bathroom wall and her eyes were almost completely swollen shut. The chief called an ambulance and asked an EMT who was shopping at Dollar General to evaluate K.H. before the ambulance arrived.

As a result of Albright's beating, K.H. suffered two nose fractures; bruising and swelling of her arms, legs, and face; head and wrist pain; dizziness; and vision problems. Albright also broke K.H.'s dentures when he repeatedly hit her in the face.

## II. Proceedings.

On October 10, the court issued a warrant for Albright's arrest. On October 18, officers executed a search warrant for Albright's home in Meservey. Officers found a cordless drill sitting upside down on a chair near the mattress in the living room.

Officers located and arrested Albright on October 19 at a home in Mason City. The State charged Albright with willful injury resulting in serious injury, a class "C" felony, in violation of Iowa Code section 708.4(1) (2016), and kidnapping in the first degree, a class "A" felony, in violation of Iowa Code sections 710.1 and 710.2.

At trial, the State entered evidence that Albright had been abusive and controlling of K.H. and that she had tried to leave him in the past. Defense counsel did not object to the testimony and asked questions of K.H. that resulted in further prior bad acts evidence. The State and defense counsel also introduced evidence of Albright's prior convictions and jail time. Defense counsel did not request a limiting instruction on the prior bad acts or prior convictions evidence, and the district court did not give a limiting instruction to the jury.

The jury found Albright guilty of willful injury causing bodily injury and kidnapping in the first degree. The district court entered judgment, ordering Albright to serve a term not to exceed five years for the willful injury conviction and life in prison for the kidnapping conviction. The district court ordered Albright to pay a $750 fine, 35% surcharge, and "court costs in the amount assessed by the Clerk" for the willful injury

conviction. The district court also ordered Albright to pay court costs for the kidnapping conviction. Regarding his reasonable ability to pay, the district court's order said,

> Pursuant to Iowa Code section 910.2, Defendant is found to have the reasonable ability to pay the obligations set forth herein, including but not limited to any crime victim assistance reimbursement, restitution to public agencies, and court costs including correctional fees, court-appointed attorney fees, contribution to a local anticrime organization, or restitution to the medical assistance program.

Albright appealed his convictions and sentences.

**III. Issues.**

Albright raises four issues on appeal. First, whether the State presented sufficient evidence to support his conviction of first-degree kidnapping. Second, whether the district court erred in submitting kidnapping in the second degree as a lesser included offense of kidnapping in the first degree. Third, whether counsel was ineffective by failing to object to and by introducing evidence of Albright's other crimes, wrongs, or other acts. Fourth, whether the district court was wrong in ordering Albright to pay restitution without first considering his reasonable ability to pay.

**IV. Whether the State Presented Sufficient Evidence to Support Albright's Conviction of First-Degree Kidnapping.**

Albright argues the State did not present sufficient evidence to prove two of the elements of first-degree kidnapping: (1) confinement and/or removal and (2) torture.

**A. Standard of Review.** We review challenges to the sufficiency of evidence for correction of errors at law. *State v. Copenhaver*, 844 N.W.2d 442, 449 (Iowa 2014). We review all of the evidence presented at trial and consider it in the light most favorable to the State. *Id.* When the evidence

could convince a rational trier of fact that the defendant is guilty beyond a reasonable doubt, the verdict is supported by substantial evidence. *State v. Bower*, 725 N.W.2d 435, 444 (Iowa 2006).

**B. Whether Albright Preserved Error on the Issue.** The State contends Albright did not preserve error on this issue. Albright argues he preserved error by moving for a judgment of acquittal.

Counsel does not preserve error on a sufficiency-of-evidence issue when counsel makes a general motion for judgment of acquittal but fails to identify specific elements of the charge not supported by the evidence. *See State v. Crone*, 545 N.W.2d 267, 270 (Iowa 1996) (en banc). The exception to this error preservation rule is when "grounds for a motion were obvious and understood by the trial court and counsel." *State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005). In *Williams*, we held the element to which counsel referred in his motion for acquittal was "obvious and understood" by the trial court and opposing counsel when the crime required the prosecution to prove only two elements and the parties stipulated the second element was present. *Id.* at 28.

Here, at the close of the State's evidence, defense counsel asserted,

> I do have one motion, Judge. Comes now, Mr. Albright, through counsel, and moves to dismiss this matter and hold it in arrest of judgment for the reason that all of the evidence that's been presented, even when it's viewed in the best light for the State, could not allow these people to form or find— engender a jury question.

Again, at the close of all evidence, defense counsel renewed his motion, stating,

> Comes now, the defendant, again through counsel, and moves for a directed verdict of acquittal on the grounds that all of the evidence, even in the best light for the State, would not engender a jury question.

In his motions, defense counsel did not identify the specific elements of the charge of kidnapping in the first degree for which sufficient evidence was lacking. Defense counsel's motions do not fall under the "obvious and understood" exception either.

The State was required to prove four elements in this case to prove kidnapping in the first degree. It was also required to prove three elements to prove willful injury causing bodily injury. When defense counsel failed to mention any of the elements in his motions for acquittal, neither the trial court nor counsel could be certain as to which element or elements defense counsel was arguing sufficient evidence did not support. *Cf. Williams*, 695 N.W.2d at 28. The present case is unlike *Williams*, where the parties stipulated to one of the two elements needed to prove domestic abuse assault. *See id.* Thus, in *Williams* it was clear which element was the fighting issue of the case. *See id.* Here, Albright did not stipulate to any of the elements of kidnapping in the first degree. The court could not know what element or elements Albright's counsel was referring to in his motions. Therefore, the *Williams* exception does not apply.

Our conclusion is supported by the prosecutor's statement following defense counsel's second motion for acquittal where she said, "[T]he State resists and believes that the evidence, even at the close of the record, creates a genuine issue of material fact upon which a jury could render verdicts on Count I and/or Count II." This indicates it was not "obvious and understood" by opposing counsel which elements of the kidnapping charge defense counsel was referring to in his motion. The State did not know whether defense counsel was referring to the kidnapping charge or

the willful injury charge, let alone which particular elements of the charge.[1]

Moreover, the court too, in its initial analysis deciding whether to grant defense counsel's first motion for acquittal, went through all of the elements of both the kidnapping and willful injury charges. Thus, it was not "obvious and understood" by the court that defense counsel's motion referred to any particular elements of kidnapping.

Accordingly, we find Albright did not preserve error on his sufficiency-of-evidence claim.

**C.** **Whether Counsel Was Ineffective for Failing to Preserve Error on the Issue of the Sufficiency of the Evidence of Kidnapping in the First Degree.** Albright argues in the alternative that if he did not preserve error, counsel was ineffective for failing to preserve error. We review claims of ineffective assistance of counsel de novo because such claims have their basis in the Sixth Amendment to the United States Constitution. *State v. Canal*, 773 N.W.2d 528, 530 (Iowa 2009). To prevail on a claim of ineffective assistance, the claimant must show both that counsel failed to perform an essential duty and that prejudice resulted. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *accord State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008).

For the first prong—counsel failed to perform an essential duty—the claimant must show counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. *Canal*, 773 N.W.2d at 532. We measure counsel's performance against the

---

[1]It later became clear that defense counsel was referring to the kidnapping charge only, not the willful injury charge, when he gave his closing argument, saying, "And he knows he committed willful injury. And we think he's guilty of willful injury." However, which of the elements of kidnapping defense counsel believed the evidence was insufficient for remained unclear.

standard of a reasonably competent practitioner, and we begin with the presumption that counsel performed his or her duties competently. *State v. Clay*, 824 N.W.2d 488, 495 (Iowa 2012). We objectively consider whether counsel's performance was reasonable under prevailing professional norms in light of all of the circumstances. *State v. Lyman*, 776 N.W.2d 865, 878 (Iowa 2010), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699 (Iowa 2016). In making this determination, we avoid second-guessing or making hindsight evaluations. *Maxwell*, 743 N.W.2d at 196.

For the second prong—prejudice—the claimant must prove there is a reasonable probability that the outcome of the proceeding would have been different but for counsel's unprofessional errors. *Canal*, 773 N.W.2d at 532. The claimant need not show that it is more likely than not the proceeding would have been different, but only that the probability of a different result is "sufficient to undermine confidence in the outcome." *Bowman v. State*, 710 N.W.2d 200, 206 (Iowa 2006) (quoting *State v. Graves*, 668 N.W.2d 860, 882 (Iowa 2003)). To make this determination, we consider what factual findings counsel's errors affected and whether the effect was pervasive or isolated and trivial. *Id.* at 882–83.

Albright argues his counsel was ineffective by failing to make a specific motion for judgment of acquittal based on insufficient evidence to prove the charge of kidnapping. Specifically, he argues the prosecutor did not prove the elements of "confinement and/or removal" and "intentionally subjected to torture" by sufficient evidence.

An ineffective-assistance-of-counsel claim founded on counsel's failure to raise a claim of insufficient evidence to support a conviction is a claim a defendant can raise on direct appeal. *State v. Truesdell*, 679 N.W.2d 611, 616 (Iowa 2004), *superseded by statutory amendment on*

*other grounds*, 2004 Iowa Acts ch. 1057, § 1 (codified at Iowa Code § 124.401(4) (2005)), *as recognized in State v. Milom*, 744 N.W.2d 117, 121–22 (Iowa 2007). If the record does not reveal substantial evidence to support the convictions, counsel was ineffective for failing to raise the issue. *Id.* If, however, the record contains sufficient evidence, counsel's failure to raise the claim was not prejudicial and the claimant's ineffective-assistance-of-counsel claim fails. *Id.*

*1. Sufficiency of evidence for element of confinement and/or removal.* To prove Albright committed first-degree kidnapping, the State was required to prove Albright confined K.H. or removed her from one place to another. *See* Iowa Code § 710.1 (2016). The court instructed the jury on confinement or removal as follows:

> For purposes of these instructions, a person is "confined" when her freedom to move about is substantially restricted by force, threat, or deception. The person may be confined either in the place where the restriction began or in a place to which she has been removed. No minimum time of confinement or distance of removal is required, but it must be more than slight. The confinement or removal must have significance apart from any other crime committed against the person and must substantially increase the risk of harm to the person, significantly reduce the risk to Defendant of detection, or significantly ease the escape of Defendant.

In *State v. Rich*, we adopted the incidental rule for kidnapping offenses. 305 N.W.2d 739, 745 (Iowa 1981). The incidental rule establishes that confinement or removal as used in the kidnapping statute requires more than confinement or removal that is an inherent incident of the commission of another crime. *Id.* "The rationale for this conclusion is that we do not believe the legislature intended to afford the prosecution a choice of two penalties of such a disparate nature for the typical crime of sexual abuse." *Id.*

The outcome from *Rich* has been our application of a three-prong test to determine whether confinement or removal can support a conviction of kidnapping. *See, e.g., State v. Robinson*, 859 N.W.2d 464, 478–79 (Iowa 2015). The test is essentially contained in the instructions the court gave to the jury in this case. The three prongs include confinement or removal that (1) "substantially increases the risk of harm to the victim," (2) "significantly lessens the risk of detection," or (3) "significantly facilitates escape of the perpetrator." *Rich*, 305 N.W.2d at 745–46. One prong must be present to support a kidnapping conviction alongside the underlying crime. *See Robinson*, 859 N.W.2d at 478.

The State first argues the incidental rule does not apply in cases alleging torture because torture is not a separate underlying offense. However, this court has applied the incidental rule and three-prong analysis when considering torture as the offense on which the State has based a kidnapping charge. *See State v. Siemer*, 454 N.W.2d 857, 864 (Iowa 1990).

In *Siemer*, a man handcuffed his girlfriend's seven-year-old child to a bed in the basement furnace room of their home and subjected the child to horrendous torture. *Id.* at 858–59. We upheld the kidnapping conviction in that case, reasoning Siemer's movement and confinement of the child to the basement room "substantially increased the risk of harm to the child and significantly lessened the risk that Siemer's infliction of chronic abuse would be detected." *Id.* at 864. We further held the record contained substantial evidence to support a finding the confinement in that case exceeded confinement normally incidental to the underlying crime of child abuse. *Id.* at 864–65.

While torture alone may not be a codified offense, we have defined torture under section 710.2, kidnapping in the first degree, as subjecting

a person to "physical and/or mental anguish." *State v. White*, 668 N.W.2d 850, 857 (Iowa 2003). Torture therefore appears to encompass any codified acts that would cause physical and/or mental anguish, such as child abuse, assault with a deadly weapon, or intentional infliction of bodily injury. *See Siemer*, 454 N.W.2d at 864–65; *White*, 668 N.W.2d at 857; *State v. Cross*, 308 N.W.2d 25, 27 (Iowa 1981). It would not make sense to require more than incidental confinement or movement to establish first-degree kidnapping when the underlying crime is robbery or sexual assault but allow the movement or confinement to be incidental for other underlying crimes, such as child abuse.

The State attempts to equate this case to "the classic kidnapping case in which an individual is abducted for the express purpose of holding the person for ransom or as a hostage," as discussed in *State v. Misner*, 410 N.W.2d 216, 223 (Iowa 1987). The *Misner* court said that in such cases, the incidental rule does not apply. *Id.* at 223–24. We disagree with the State that this case falls under the "classic kidnapping" realm of cases.

In this case, Albright prevented K.H. from leaving her own home with physical violence and threats of force. He beat and abused K.H. Unlike the classic kidnapping cases described in *Misner*, *id.* at 223, Albright neither abducted K.H. to hold her as ransom or hostage, nor refrained from committing other crimes against her. When a victim is tortured, he or she has suffered some physical or mental anguish beyond abduction. Therefore, we decline to adopt the State's argument that the incidental rule does not apply when a kidnapping charge involves torture.

The question then is whether there is sufficient evidence of Albright's confinement of K.H. in the house by use of physical force or threat, or Albright's moving of K.H. from the house to the veterinarian clinic and gas station for a jury to find Albright guilty of kidnapping. Since our adoption

of the three-prong *Rich* analysis, we have overturned kidnapping convictions based on insufficient evidence to prove the element of confinement or removal in only a few cases. *See Robinson*, 859 N.W.2d at 482; *State v. Mead*, 318 N.W.2d 440, 445 (Iowa 1982); *State v. Marr*, 316 N.W.2d 176, 180 (Iowa 1982).

In *Marr*, the defendant began following the victim while she was walking home from a drug store at ten in the evening. *Marr*, 316 N.W.2d at 177. The defendant ran up behind the victim while she was on the sidewalk directly in front of her apartment, she screamed, and he placed his hand over her mouth threatening her not to scream again. *Id.* The defendant slammed the victim against the corner of the building; shoved her to the ground; and forced her around the side of the building into a gangway separating the apartment building from a neighboring house, about ten to fifteen feet from where he had attacked her. *Id.* at 177–78. The defendant pinned one of the victim's arms behind her back, choked her, lifted her shirt and pulled down her pants, and sexually abused the victim for two or three minutes until the victim's husband stopped the attack. *Id.* at 178.

There, we held the facts did not warrant the conviction of kidnapping because the confinement or removal of the victim did not exceed that normally incidental to the commission of sexual abuse. *Id.* at 180. We reasoned that holding otherwise would turn every rape, robbery, or "other assault involving some minimal degree of confinement or removal" into a kidnapping. *Id.* at 179. We held the means by which the defendant gained control of the victim and the duration of that control distinguished *Marr* from prior cases where we affirmed kidnapping convictions. *Id.* at 179; *cf. State v. Knupp*, 310 N.W.2d 179, 182–83 (Iowa 1981) (upholding a conviction where the defendant pulled the victim into his vehicle, drove

her to a parking lot under an overpass bridge, and proceeded to forcefully rape her); *Rich*, 305 N.W.2d at 745–46 (upholding a conviction where the defendant removed the victim from an open mall walkway, bound her hands behind her back, placed her in a wheel barrow and covered her with trash, screamed at her to remain silent, and took her to a mall restroom to sexually assault her).

In *Mead*, the defendant waited on the porch of the victims' home until they arrived, began talking to them about the neighborhood, and then followed them into their home uninvited when they opened the door. *Mead*, 318 N.W.2d at 441–42. The defendant then held a knife to the neck of one of the victims and said, "This woman is dead." *Id.* at 442. The victim freed herself and ran out of the house for help as the defendant struck the second victim in the face, kicked the second victim on the ground, and ripped the second victim's purse away from her. *Id.* The defendant ran out of the back of the home with the victim's purse. *Id.*

There, the State argued the defendant had committed kidnapping by confining the victim when he grabbed her around the neck. *Id.* at 443. We drew a distinction between a seizure and confinement and held the facts did not warrant the conviction of kidnapping because the defendant only seized the victim. *Id.* at 445.

More recently, in *Robinson*, we reversed a kidnapping conviction, finding the facts did not show confinement or removal beyond that normally associated with sexual assault. *Robinson*, 859 N.W.2d at 481–82. In that case, the victim returned to the defendant's apartment with him willingly after the two met at a bar. *Id.* at 466. When the victim took out her phone to make a call, the defendant grabbed the phone and threw it out of the victim's reach. *Id.* When the defendant went to use the restroom, the victim grabbed her purse and left the apartment. *Id.* The

victim realized she had left her phone in the apartment and went back to retrieve it. *Id.* When she reentered the apartment, the defendant shut and locked the door behind her, grabbed her by the neck, covered her mouth, and dragged her down the hall to the bedroom. *Id.* The defendant locked the bedroom door, threw the victim on the bed, and sexually assaulted her. *Id.* The assault ended when a neighbor, who heard screams, called the police and the police arrived, kicking down the door. *Id.*

In *Robinson*, we reasoned that the defendant's actions of tossing the cell phone, locking the doors, covering the victim's mouth, and moving the victim from the living room to the bedroom within the apartment, did not warrant a conviction of kidnapping. *Id.* at 481. We said, "While there might be some marginal increase in the risk of harm, lessening of dete[c]tion, or facilitation of escape, we conclude it is not sufficient to trigger dramatically increased sanctions under our kidnapping statute in this case." *Id.* at 482. We further reasoned that to be punishable for kidnapping, the removal or confinement must add substantially to the heinousness of the underlying crime. *Id.*

In the present case, the State presented evidence that Albright prevented K.H. from leaving their house in Meservey for over thirteen hours. Albright began assaulting K.H. at approximately 1:30 a.m. When K.H. tried to leave the house, Albright stopped her by blocking the door and shoving her against the wall and telling her to get back inside the house. Even if K.H. had managed to escape, she had no cell phone and nowhere to go because she had no vehicle. Albright hit K.H. in the face, threw her onto the floor and slammed her head into the floor, hit K.H. in the pelvis with a cordless drill, used a knife to cut behind K.H.'s ear, used a Taser on K.H.'s wrists, and allowed his dog to bite K.H.'s body. The beatings continued for hours.

This case is unlike the above three cases where we reversed the kidnapping convictions in that the duration of confinement here was substantially longer. The defendants in *Marr, Mead,* and *Robinson* confined their victims for a matter of a few minutes to an hour. Here, Albright confined K.H. for over thirteen hours. This was not a "minimal degree of confinement." *Marr*, 316 N.W.2d at 179 (discussing that many crimes involve some minimal degree of confinement).

Our kidnapping cases have generally held that the increased-risk-of-harm prong of the *Rich* test is satisfied when the duration of confinement substantially exceeded the underlying crime. *See, e.g., State v. Griffin*, 564 N.W.2d 370, 373 (Iowa 1997) (noting the defendant had the victim remove her clothing so that she would not leave the hotel room and she remained there the entire night after the assault); *State v. McGrew*, 515 N.W.2d 36, 40 (Iowa 1994) (noting the victim did not escape from the defendant for more than four hours after he broke into her home and a considerable amount of time after the sexual assault ended).

This case is similar to *Griffin*, where a jury convicted a husband of kidnapping his wife. *See Griffin*, 564 N.W.2d at 372. In that case, the defendant and his wife, the victim, were staying in a motel room together. *Id.* The defendant ordered the victim to undress so she would not leave the room, then held her down on the bed, choked her, and accused her of being unfaithful. *Id.* The defendant repeatedly hit the victim on her head and body with a bottle and sexually assaulted her with the bottle. *Id.* She eventually lost consciousness, and the defendant continued to sexually abuse her. *Id.*

The victim did not regain consciousness until 1:30 p.m. the day following the assault, approximately sixteen hours after she had arrived at the motel. *Id.* When the victim regained consciousness, her sister, who

was also staying at the motel, came to the room while the defendant was gone, and the victim asked her sister to call the police. *Id.* The defendant in that case, like Albright, was convicted of willful injury and kidnapping, and he challenged the evidence supporting his kidnapping conviction. *Id.* We upheld Griffin's conviction, finding his confinement of his victim in the motel room lowered the chances of detection of the sexual assault. *Id.* at 373.

Like the defendant in *Griffin*, Albright confined K.H. for an extensive period—a period longer than it would normally take to commit an underlying offense of assault. *See id.* at 373. While the defendant in *Griffin* had his victim remove her clothing to prevent her from leaving, Albright prevented K.H. from leaving the house by blocking her exit and physically stopping her. *See id.* In *Griffin*, we said that even though the victim voluntarily entered the motel room, the confinement before and after the assault took the confinement beyond that incidental to sexual assault. *Id.*

Here, Albright confined K.H. all through the night and the following morning, with periods of assault occurring throughout. Even though Albright rested on the bed for some time, we still find that K.H. was confined. *See McGrew*, 515 N.W.2d at 39–40. In *McGrew*, the defendant fell asleep on the bed after sexually assaulting the victim, and the victim stayed next to him on the bed for hours, too scared to move until she finally had the courage to escape when she was sure he was sleeping. *Id.* at 38. Similarly, K.H. was too scared to try to escape because, when she would move away from Albright as he rested, he would wake.

Albright's confinement of K.H. substantially increased the risk of harm to K.H. If Albright had not confined K.H. to the house, she would have been free to leave and further injury would have been prevented.

Albright did not give her that opportunity. Moreover, the secluded nature of the home significantly decreased the likelihood of detection. *See id.* at 40 ("Choosing the seclusion of his victim's own bedroom as the situs of the offense lessened the risk of detection for McGrew. However, that seclusion also increased the risk of harm to Horning because McGrew, with his victim secluded, was free to deal with her as he wished.").

Therefore, we find substantial evidence exists to support the jury's finding that Albright confined K.H. in their Meservey home. Accordingly, Albright's counsel was not ineffective for failing to raise whether substantial evidence existed on the issue of confinement at trial. Because we find substantial evidence exists as to confinement, we need not analyze the argument that the movement of K.H. from the house to the veterinarian clinic or gas station would satisfy this element.

*2. Sufficiency of evidence for element of torture.* To prove first-degree kidnapping, the State was required to show intentional infliction of severe physical or mental pain. *Cross*, 308 N.W.2d at 26–27. We have analyzed torture as an element of kidnapping in several cases before. *See State v. Schertz*, 328 N.W.2d 320, 321–22 (Iowa 1982); *Cross*, 308 N.W.2d at 26–27.

In *Cross*, we found the element of torture was satisfied for first-degree kidnapping when the defendant removed the victim's clothing, struck the victim several times, touched and bit her breasts, chained her hands, exposed himself to her, sexually assaulted her with his hands, and carried her in his car trunk for miles while she was nude and unconscious. 308 N.W.2d at 27. The torture lasted twelve hours, during which the defendant constantly threatened to kill the victim and inflict sexual abuses. *Id.*

In *Schertz*, we found torture when the defendant and the other abductors tied the victim to a park tree and severely beat him. *Schertz*, 328 N.W.2d at 321–22. The victim was bound to a tree with his belt, gagged with strips of his shirt, kicked, and struck in the head numerous times. *Id.* We noted that as a result of the beating, the victim had multiple lacerations on his scalp, a fractured rib, bruising of the right chest wall, and other bruises and abrasions. *Id.* at 322.

In the present case, the State presented evidence through testimony and photographs of K.H.'s injuries that K.H. experienced severe physical pain. Albright beat K.H. intermittently for thirteen hours, causing numerous physical injuries. Albright punched and hit K.H. in the face with his hands; hit her in the pelvis with a cordless drill; cut behind K.H.'s ear with a knife; burnt her wrists with a Taser; broke her dentures; and allowed his dog to latch onto her leg, resulting in puncture wounds from the multiple bites. In addition, Albright threatened K.H., telling her he would bury her in a cornfield up to her head and let a combine cut her head off, and he repeatedly called her a whore and other derogatory names.

The officer who arrived at Dollar General when K.H. called the police testified that K.H.'s eyes were almost completely swollen shut, her face was swollen, and it appeared to him that K.H.'s cheeks and nose were probably broken. The EMT at the scene testified that dried blood was coming from K.H.'s ear and dried blood covered her lips. The EMT further testified K.H.'s forearms and hands were swollen and bruised. The officer and the EMT both testified that K.H. sounded and appeared scared.

K.H.'s severe physical injuries are evident from the photo exhibits and the testimony of the officer, EMT, and K.H. herself. Like the victim in *Schertz*, K.H. was severely beaten. *See Schertz*, 328 N.W.2d at 321–22. However, Albright beat K.H. much longer than the defendant beat the

victim in *Schertz.* *See id.* Like the defendant in *Cross*, who confined his victim for twelve hours of torture, Albright confined K.H. to the house and then to his car for around thirteen hours and subjected K.H. to a multitude of different physical pains. *See Cross*, 308 N.W.2d at 27.

Therefore, we find substantial evidence exists to support a finding that Albright tortured K.H. Accordingly, Albright's counsel was not ineffective for failing to raise whether substantial evidence existed on the issue of torture at trial.

### V. Whether the District Court Erred in Submitting Kidnapping in the Second Degree as a Lesser Included Offense of Kidnapping in the First Degree.

Albright argues the district court erred in instructing the jury on kidnapping in the second degree as a lesser included offense of kidnapping in the first degree. The State argues because no prejudice resulted from this instruction, his argument must fail. We agree.

We review challenges to jury instructions for correction of errors at law. *State v. Hanes*, 790 N.W.2d 545, 548 (Iowa 2010). In doing so, we determine whether the challenged instruction accurately states the law and whether substantial evidence supports it. *State v. Predka*, 555 N.W.2d 202, 204 (Iowa 1996). We are not required to reverse unless the error was prejudicial to the defendant. *State v. Spates*, 779 N.W.2d 770, 775 (Iowa 2010).

When a jury convicts a defendant of a greater offense, no prejudice results from the jury considering his guilt of a lesser offense. *State v. Douglas*, 485 N.W.2d 619, 623 (Iowa 1992). Here, the jury convicted Albright of kidnapping in the first degree. Therefore, the court's instruction to consider kidnapping in the second degree did not prejudice Albright.

**VI.  Whether Counsel Was Ineffective by Failing to Object to and by Introducing Evidence of Albright's Other Crimes, Wrongs, or Other Acts.**

Albright argues he suffered prejudice by his counsel's failure to object to the prosecution's introduction of and his counsel's own introduction of his prior bad acts.  To be ineffective, we require a showing of "more than mere '[i]mprovident trial strategy, miscalculated tactics, mistake, carelessness or inexperience' " to find counsel failed to perform an essential duty.  *State v. Cromer*, 765 N.W.2d 1, 8 (Iowa 2009) (alteration in original) (quoting *Parsons v. Brewer*, 202 N.W.2d 49, 54 (Iowa 1972)).  Here, Albright claims defense counsel not only failed to object to evidence of Albright's other crimes, wrongs, or other acts, but affirmatively introduced evidence of Albright's other crimes, wrongs, or other acts.  This leads us to believe that defense counsel's trial strategy may have included the admissibility of these matters.

We cannot tell from the record what was going through defense counsel's mind when he allowed such matters into evidence without objection and then introduced similar matters into evidence.  Under these circumstances, "[w]e prefer to reserve such questions for postconviction proceedings so the defendant's trial counsel can defend against the charge."  *State v. Tate*, 710 N.W.2d 237, 240 (Iowa 2006).  Accordingly, we will not reach these issues on direct appeal.  Of course, Albright can raise them in a postconviction-relief action if he so desires.

**VII.  Whether the District Court Erred in Ordering Albright to Pay Restitution Without First Considering His Reasonable Ability to Pay.**

We review restitution orders for correction of errors at law.  *State v. Klawonn*, 688 N.W.2d 271, 274 (Iowa 2004).  "[W]e determine whether the court's findings lack substantial evidentiary support, or whether the court

has not properly applied the law." *Id.* (quoting *State v. Bonstetter*, 637 N.W.2d 161, 165 (Iowa 2001)).

**A.** **Relevant Statutory Provisions.** Prior to addressing the restitution issue, it is important to review the statutory scheme of our restitution statutes contained in chapter 910. The Code defines restitution as the "payment of pecuniary damages to a victim in an amount and in the manner provided by the offender's plan of restitution." Iowa Code § 910.1(4). The Code defines pecuniary damages as

> all damages to the extent not paid by an insurer on an insurance claim by the victim, which a victim could recover against the offender in a civil action arising out of the same facts or event, except punitive damages and damages for pain, suffering, mental anguish, and loss of consortium. Without limitation, "pecuniary damages" includes damages for wrongful death and expenses incurred for psychiatric or psychological services or counseling or other counseling for the victim which became necessary as a direct result of the criminal activity.

*Id.* § 910.1(3).

> The Code also includes the following as items of restitution:

> fines, penalties, and surcharges, the contribution of funds to a local anticrime organization which provided assistance to law enforcement in an offender's case, the payment of crime victim compensation program reimbursements, payment of restitution to public agencies pursuant to section 321J.2, subsection 13, paragraph "b", court costs including correctional fees approved pursuant to section 356.7, court-appointed attorney fees ordered pursuant to section 815.9, including the expense of a public defender, and the performance of a public service by an offender in an amount set by the court when the offender cannot reasonably pay all or part of the court costs including correctional fees approved pursuant to section 356.7, or court-appointed attorney fees ordered pursuant to section 815.9, including the expense of a public defender, and payment to the medical assistance program pursuant to chapter 249A for expenditures paid on behalf of the victim resulting from the offender's criminal

activities including investigative costs incurred by the Medicaid fraud control unit pursuant to section 249A.50.

*Id.* § 910.1(4).

After the Code lists what items are included as restitution, the Code then instructs the court on how it should order restitution. *Id.* § 910.2(1). It creates two categories of restitution. *See id.* The items in the first category are restitution "to the victims of the offender's criminal activities [and] to the clerk of court for fines, penalties, [and] surcharges." *Id.* The court is required to order restitution for the items in this first category regardless of the offender's reasonable ability to pay. *Id.*

> The items of restitution in the second category are
>
> for crime victim assistance reimbursement, restitution to public agencies pursuant to section 321J.2, subsection 13, paragraph "b", court costs including correctional fees approved pursuant to section 356.7, court-appointed attorney fees ordered pursuant to section 815.9, including the expense of a public defender, when applicable, contribution to a local anticrime organization, or restitution to the medical assistance program pursuant to chapter 249A.

*Id.* The court can only order restitution for items in this second category to the extent the offender has the reasonable ability to pay. *Id.* If the court finds an offender is not reasonably able to pay all or a part of the items in the second category, the court may order community service in lieu of restitution under the terms and conditions set forth in the Code. *Id.* § 910.2(2).

The Code also instructs the court on how it is to obtain the amount of each item of restitution listed in section 910.2(1). *Id.* § 910.3. The county attorney is to

> prepare a statement of pecuniary damages to victims of the defendant and, if applicable, any award by the crime victim compensation program and expenses incurred by public agencies pursuant to section 321J.2, subsection 13, paragraph "b", and shall provide the statement to the

> presence investigator or submit the statement to the court at the time of sentencing.

*Id.*

> The clerk of court is required to

> prepare a statement of court-appointed attorney fees ordered pursuant to section 815.9, including the expense of a public defender, and court costs including correctional fees claimed by a sheriff or municipality pursuant to section 356.7, which shall be provided to the presentence investigator or submitted to the court at the time of sentencing.

*Id.* If the county attorney or the clerk of court provides these items of restitution to the presentence investigator, these items shall be included in the presentence report. *Id.* If the amount of pecuniary damages is "not available at the time of sentencing, the county attorney shall provide a statement of pecuniary damages incurred up to that time to the clerk of court." *Id.* The Code requires the county attorney to provide this statement to the clerk of court no later than thirty days after sentencing. *Id.*

At the time of sentencing, the court is required to set out the amount of restitution, including the amount of public service the offender must perform as restitution and the persons to whom the offender must pay. *Id.* The Code recognizes that the full amount of restitution may not be available at the time of sentencing. *Id.* If the court cannot determine the full amount of restitution at the time of sentencing, "the court shall issue a temporary order determining a reasonable amount for restitution identified up to that time." *Id.*

If the court enters a temporary order, the court shall issue a permanent or supplemental order setting the full amount of restitution. *Id.* If necessary, the court shall enter further supplemental orders. *Id.* The temporary, permanent, and supplemental orders are the plan of

restitution of the court. *Id.* The plan of restitution is part of the sentencing process of the offender. *State v. Harrison*, 351 N.W.2d 526, 528 (Iowa 1984). After the plan of restitution is ordered, "the next step is establishing a plan of payment." *Id.*

While an offender is incarcerated, the director of the Iowa Department of Corrections shall prepare a plan of payment in accordance with the department's administrative rules. Iowa Code § 910.5(1)(*d*), (5); *see also* Iowa Admin. Code r. 201—20.11 (administrative rules governing plans of restitution while offender is incarcerated). The director of the Iowa Department of Corrections must determine the plan of restitution as a condition of work release or parole. Iowa Code § 910.5(2), (3), (4).

If the offender is on probation, the office or individual charged with supervising the offender while on probation reviews the plan of restitution and submits a plan of payment to the sentencing court. *Id.* § 910.4(2)(*a*). All of these determinations may be subject to review by the court if the offender or the office or individual who prepared the offender's restitution plan petitions the court. *Id.* § 910.7(1). The office or individual preparing the plan of payment is required to forward the plan to the clerk of court in the county in which the offender was sentenced. *Id.* § 910.6. If an offender files a petition within thirty days from the entry of the plan of payment, we consider the petition under section 910.7(1) an extension of the criminal matter allowing for appointment of counsel. *State v. Jose*, 636 N.W.2d 38, 47 (Iowa 2001).

**B. Application of Relevant Statutory Provisions Generally.** The first order of business by the district court is to determine the plan of restitution. In an ideal world, all amounts of restitution would be before the court at the time of sentencing. By this decision, we are urging the sentencing court to take whatever steps necessary to ensure the items of

restitution are before the court at the time of sentencing. If not all of the items of restitution are available at the time of sentencing, the Code allows the sentencing court to file temporary, supplemental, and permanent orders prior to the final plan of restitution. Iowa Code § 910.3. This constellation of orders is the plan of restitution under the Code. *Id.*

A plan of restitution is not complete until the court issues the final restitution order. *State v. Jackson*, 601 N.W.2d 354, 357 (Iowa 1999). Until the court issues the final restitution order, the court is not required to consider the offender's reasonable ability to pay. *Id.* Restitution orders entered by the court prior to the final order are not appealable as final orders or enforceable against the offender. The reason for these orders being nonappealable or enforceable is that the final order of restitution must take into account the offender's reasonable ability to pay. Iowa Code § 910.3.

Once the court has all of the items of restitution before it, it must determine a final amount of restitution and/or community service in its final order. To do this the court must determine restitution for the victim and court fines, penalties, and surcharges payable to the clerk of court. The court is required to assess these amounts against the offender regardless of the offender's reasonable ability to pay. *Id.*

The court can only assess the remaining items of restitution against the offender in an amount commensurate with the offender's reasonable ability to pay. *Id.* We discussed the meaning of reasonable ability to pay in a case discussing the predecessor to section 910.3.[2] *See State v. Haines*, 360 N.W.2d 791, 793–94 (Iowa 1985). The inclusion of the reasonable-ability-to-pay requirement makes these restitution provisions

---

[2]The statute in question was Iowa Code section 910.2 (Supp. 1983).

constitutional. *Id.* In *Haines*, we relied on a United States Supreme Court decision discussing an Oregon restitution statute. *Id.* at 794. The Supreme Court said several times that a defendant has the reasonable ability to pay when he or she can do so "without hardship." *Fuller v. Oregon*, 417 U.S. 40, 53–54, 94 S. Ct. 2116, 2124–25 (1974).

We also articulated an undue hardship standard as "inherent in Iowa's traditional administration of probation considerations." *State v. Rogers*, 251 N.W.2d 239, 245 (Iowa 1977) (en banc). In *Rogers*, we said a court should not order payment of restitution unless the convicted person "is or will be able to pay it without undue hardship to himself or dependents, considering the financial resources of the defendant and the nature of the burden payment will impose." *Id.*

Other states have adopted similar standards regarding reasonable ability to pay. Massachusetts has also adopted the financial hardship standard. *See Commonwealth v. Henry*, 55 N.E.3d 943, 953–54 (Mass. 2016). In *Henry*, the Massachusetts high court clarified the legal standard in the state for determining a defendant's reasonable ability to pay restitution. *See id.* It held,

> [T]he judge must consider the financial resources of the defendant, including income and net assets, and the defendant's financial obligations, including the amount necessary to meet minimum basic human needs such as food, shelter, and clothing for the defendant and his or her dependents.

*Id.* at 953. "Restitution payments that would deprive the defendant or his or her dependents of minimum basic human needs would cause substantial financial hardship." *Id.* at 954.

The Michigan courts have similarly held the standard of whether a defendant has the reasonable ability to pay is whether he or she can do so without "substantial hardship." *See People v. Jackson*, 769 N.W.2d 630,

636 (Mich. 2009) ("[T]he entity deciding whether to require repayment must take cognizance of the individual's resources, the other demands on his own and family's finances, and the hardships he or his family will endure if repayment is required. The purpose of this inquiry is to assure repayment is not required as long as he remains indigent.").

In Florida, analysis of the reasonable ability to pay similarly considers financial hardships a defendant would incur if ordered to pay restitution. Fla. Stat. Ann. § 775.089(6) (West, Westlaw through 2018 2d Reg. Sess.). There, in determining ability to pay, the court must consider the financial resources of the defendant, the present and potential future financial needs and earning ability of the defendant and his or her dependents, and other factors as the court deems appropriate. *Id.*; *Pettway v. State*, 502 So. 2d 1366, 1367 (Fla. Dist. Ct. App. 1987).

We find the sentencing court should consider all these factors when awarding the final amount of restitution based on the offender's reasonable ability to pay. If a defendant does not have the reasonable ability to pay the items, the court has three alternatives. First, the court may not order restitution for the item. Second, the court may order restitution in an amount less than the full amount of the item. Third, the court may order the offender to pay none or part of the amount of an item of restitution and perform community service in lieu of that payment under section 910.2. Of course, if in the future the offender obtains the reasonable ability to pay an item of restitution not previously assessed, the court may modify the plan of restitution upon petition. Iowa Code § 910.7.

In summary, we urge courts to do everything possible to have all items of restitution before the court at the time of sentencing. Courts must wait to enter a final order of restitution until all items of restitution are

before the court.  Once the court has all the items of restitution before it, then and only then shall the court make an assessment as to the offender's reasonable ability to pay.  A court should make every effort to determine an offender's financial condition as early as possible.  This may require the offender filing an updated financial statement, a colloquy with the offender, or both.  A court cannot impose restitution on an offender for the items subject to the offender's reasonable ability to pay if the offender does not have a reasonable ability to pay those items.  Finally, any temporary, permanent, or supplemental order regarding restitution is not appealable or enforceable until the court files its final order of restitution.[3]

**C.  Application of Relevant Statutory Provisions to This Case.**
Here the court found Albright had the reasonable ability to pay and ordered restitution for items in the second category of restitution without having the amount of each item of restitution before it.  This is contrary to the statutory scheme as outlined in this opinion.  For these reasons, we vacate the district court's sentencing order regarding restitution and remand the case to the district court to order restitution in a manner consistent with this opinion.

**VIII.  Disposition.**

We affirm Albright's convictions for willful injury causing bodily injury and kidnapping in the first degree.  On direct appeal, we do not reach Albright's claims of ineffective assistance of counsel for his counsel's failure to object to and introduction of evidence of Albright's other crimes, wrongs, or other acts.  Finally, we vacate the restitution part of the

---

[3]If not all the items of restitution are available at the time of sentencing, the court may ask the defendant to waive his or her presence at the supplemental proceeding where the ability to pay determination will be made and the final plan of restitution will be entered.

sentencing order and remand the case to the district court to order restitution in a manner consistent with this opinion.

**JUDGMENT OF CONVICTIONS AFFIRMED; SENTENCES AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

All justices concur except McDonald, J., who takes no part.