# IN THE COURT OF APPEALS OF IOWA

No. 19-0174
Filed April 29, 2020

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**MARION STEVEN GOODON,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Monona County, Jeffrey A. Neary,

Judge.

Marion Steven Goodon appeals his convictions for assault, first-degree

burglary, stalking, domestic-abuse assault causing bodily injury, and going armed

with intent.  **AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

Martha J. Lucey, State Appellate Defender, and Melinda J. Nye, Assistant

Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Timothy M. Hau, Assistant Attorney

General, for appellee.

Considered by Bower, C.J., and Greer and Ahlers, JJ.

**BOWER, Chief Judge.**

Marion Steven Goodon appeals his convictions for assault, first-degree burglary, stalking, domestic-abuse assault causing bodily injury, and going armed with intent. He contends trial counsel was ineffective in failing to challenge inconsistent verdicts, the trial court erred in admitting hearsay testimony, and the court abused its discretion in assessing court costs and correctional fees. Because the verdicts were not inconsistent and the court did not err in its evidentiary ruling, we affirm the convictions. However, we vacate the restitution portion of the sentencing order and remand to the district court.

**I. Background Facts and Proceedings.**

Viewing the evidence in the light most favorable to the State, the jury could have found the following: In mid-2018, Goodon's marriage to Amanda ended. The two were parents to a toddler, S. After the divorce, Amanda lived with S. and Amanda's older child, A. In the months following the divorce, Amanda moved to modify the terms of supervision to require Goodon's visits with S. be supervised. Goodon was upset when he found out. He started vaguely threatening Amanda with violence. Despite the divorce, Goodon did not accept the marriage was over and accused Amanda of infidelity.

In August, Goodon's behavior escalated. On more than one occasion, Goodon parked in front of Amanda's driveway so she could not access it. When Amanda asked him to move his car, he refused saying "this is public property and I have every right to stay here." Amanda met Goodon in a Wal-Mart parking lot at the end of one of Goodon's visits with S. An upset Goodon told Amanda that he

"had a full tank of gas about 400 miles and he could get in his car and he was going to drive away and we'd never see him again."

On another occasion, Amanda was dropping S. off at daycare shortly after seven in the morning. As Amanda exited the daycare, she saw Goodon "pop up out" from behind a shed, and he urged her to get in his car and talk. Amanda declined, telling Goodon she believed he was dangerous. When she tried to retreat into her child's daycare for safety, Goodon threatened, "I wouldn't do that if I were you" and gestured toward his pocket telling her, "I have a device in my pocket that will disable you from being able to do that." After a momentary pause, Amanda raced back to the daycare as Goodon called out, "You'd better go into hiding." Amanda and the daycare owner immediately contacted the police. Amanda obtained a temporary no-contact order the same day.

Amanda began to take precautions, such as blacking out the windows in her garage and home so that Goodon could not peer into them. She added extra devices to secure the doors of her home and installed motion lights. She kept a baseball bat for protection. Amanda and A. developed a safety plan; if Goodon came to the home, A. was to go and grab S. and get to safety as Amanda dealt with Goodon.

On August 23, Amanda received a phone call from a Veteran's Administration (VA) facility informing her Goodon had left the facility and had made threats of harm toward her.

On September 4, the temporary no-contact order became final. At the hearing before entry of a permanent no-contact order, Goodon did not dispute Amanda's accounts of his threatening behavior.

On September 7, Goodon purchased a knife. In the early morning hours of September 8, Goodon began texting Amanda, demanding that she talk to him despite the no-contact order. Later that day, Goodon traveled the thirty miles from his home to Amanda's, taking with him the recently-purchased knife, a baseball bat, a window punch, and pepper spray. He intended to gain entry to Amanda's home.

The evening of September 8, Amanda and A. were in their living room when they heard a loud boom. Amanda initially thought the noise came from upstairs and checked on S., who was upstairs. A. stated the noise came from the kitchen. Amanda approached the kitchen and saw Goodon inside her home walking toward her with a baseball bat raised high. He did not say anything and brought it down towards Amanda's head. She was able to catch the bat with her hands and retreat across the dining room into the living room. Goodon then swept her legs from under her, and the two landed on the ground. A. ran upstairs.

Goodon was then straddling Amanda as she struggled beneath him. He cut Amanda across the chest with a pocketknife. Amanda was able to turn and get out from under Goodon. She collected his knife, pepper spray, and window punch from the floor and threw them outdoors. As she did this, Goodon began walking upstairs to S.'s room. He returned moments later, holding S. in his arms.

Amanda urged Goodon to put S. down and permit her to change the two-year-old's wet underwear. Goodon acquiesced. He put the child down, squatted, and started asking aloud, "what am I going to do? I'm going to go to jail. I don't want to go to jail." He then made a suicide threat. When Amanda asked him not

to do so in front of the children, he responded "Oh, you think I'm the only one who's going?" and placed his hand on S.

Shortly after this exchange occurred, Amanda's stepfather George entered the home and was eventually able to talk Goodon into leaving. The police were called.

After Sergeant Jeremy Bellis of the Monona County Sheriff's Department arrived, Goodon began texting and calling Amanda again. During a phone call, Sergeant Bellis took Amanda's phone and urged Goodon to return to the house and take responsibility for his actions. Goodon stated he had no "plausible side" and that the officer "had him for breaking and entering, assault with a deadly weapon, times three, and possession of a dangerous weapon." He hung up. In the following hours, Goodon continued leaving Amanda voice mails demanding she speak with him.

The next day, Goodon called law enforcement and requested to speak to Sergeant Bellis. During their conversation, Goodon indicated he wanted to turn himself into authorities but that he had certain demands before he did so. Sergeant Bellis told him the demands would not be met. Their call was interrupted when police arrived at Goodon's home and arrested him.

Goodon was charged with five counts: (1) attempted murder, (2) burglary in the first degree, (3) stalking, (4) domestic-abuse assault by strangulation, and (5) going armed with intent. Following trial, on count one, the jury convicted Goodon of the lesser-included crime of assault; on count two, first-degree burglary; on count three, stalking; on count four, the lesser-included crime of domestic-abuse assault; and on count five, going armed with intent. The jury responded to

three special interrogatories and found beyond a reasonable doubt that at the time of burglary, Goodon was (1) armed with, (2) displayed, and (3) represented that he had a dangerous weapon.

Goodon appeals, asserting the verdicts are legally inconsistent and trial counsel was ineffective in failing to challenge them. He also asserts the court erred in allowing testimony about the telephone call from the VA center in August warning Amanda that Goodon had left the facility and had made threats to harm her. Finally, he contends the district court entered a faulty restitution order.

## II. Scope and Standards of Review.

We review allegations of ineffective assistance of counsel de novo. *See State v. Lorenzo Baltazar*, 935 N.W.2d 862, 868 (Iowa 2019). Questions of whether verdicts are inconsistent are questions of law and reviewed de novo. *State v. Merrett,* 842 N.W.2d 266, 272–73 (Iowa 2014).

Hearsay objections are reviewed for correction of errors at law. *State v. Huser,* 894 N.W.2d 472, 495 (Iowa 2017). We also review restitution orders for correction of errors at law. *State v. Albright*, 925 N.W.2d 144, 158 (Iowa 2019).

## III. Discussion.

*A. Ineffective assistance of counsel.* Goodon contends trial counsel was ineffective in failing to move for dismissal of the burglary and going-armed-with-intent convictions because the verdicts were legally inconsistent with the jury not convicting him on the attempted murder charge. He argues:

> by acquitting Goodon of attempted murder, the jury necessarily found either that Goodon did not assault Amanda with the knife and bat or that he did not intend to kill her when he did. Further, by acquitting Goodon of assault with intent to cause serious injury[, a lesser-included offense under count one,] but finding him guilty of

assault, the jury concluded Goodon did not have the specific intent to seriously injury Amanda.

Goodon's argument incorporates one of the alternate inferences the jury was allowed to determine whether a device might be considered a dangerous weapon by the jury instruction:

> A "dangerous weapon" is any device or instrument designed primarily for use in inflicting death or injury, and when used in its designed manner is capable of inflicting death. *It is also any sort of instrument or device actually used in such a way as to indicate the user intended to inflict death or serious injury,* and when so used is capable of inflicting death.

(Emphasis added.)

To prevail on his claim of ineffective assistance of counsel, Goodon must show his counsel (1) breached an essential duty and (2) prejudice resulted from the breach. *See Strickland v. Washington,* 466 U.S. 668, 687 (1984). If the proponent fails to prove either, the ineffective-assistance claim fails. *Lorenzo Baltazar*, 935 N.W.2d at 868.

Because counsel has no duty to raise a meritless objection, *see id.* at 871, we must determine whether the jury's verdicts are "so logically and legally inconsistent as to be irreconcilable within the context of the case." *State v. Fintel*, 689 N.W.2d 95, 101 (Iowa 2004). Our review of a jury's verdicts for consistency is highly deferential; verdicts are to be liberally construed to give effect to the intention of the jury and to harmonize the verdicts if it is possible to do so. *See Merrett*, 842 N.W.2d at 274–75. In conducting the analysis, the court should look to the pleadings and instructions to determine whether the verdicts are so inconsistent as to be set aside. *State v. Halstead,* 791 N.W.2d 805, 815 (Iowa

2010).[1] Additionally, we give "all reasonable presumptions . . . in favor of the general verdict. Nothing is presumed in aid of the special finding. If the general verdict thus aided is not in irreconcilable conflict with the special finding the former must stand." *State v. Propps,* 190 N.W.2d 408, 411 (Iowa 1971) (citation omitted); *accord Merrett,* 842 N.W.2d at 276 n.5.

The defense focused on undermining the State's evidence of specific intent to kill or seriously injure Amanda. When testifying, Goodon did not deny forcing his way into Amanda's home while armed with a bat, a knife, pepper spray, and a window punch. Instead, he denied striking her and possessing the intent to kill her. Goodon testified, "I did not form any intention to kill her. My purpose there was not to hurt anybody that day." Defense counsel's closing argument urged the jury to find the State failed to establish Goodon's intent to harm. On the attempted-murder count, the jury's verdict—guilty of the lesser-included offense of assault—suggests that it found Goodon possessed the specific intent to assault Amanda but did not possess the intent to kill her.

As the jury was instructed here on count one, the jury could find Goodon assaulted Amanda and reject a finding of the specific intent element of attempted murder, that is, Goodon did not specifically intend to cause Amanda's death.[2] The

---

[1] This is not a case in which the jury convicted a defendant of a compound offense while acquitting on a predicate offense. *See Halstead*, 791 N.W.2d at 815 ("When a jury convicts a defendant of a compound offense, but acquits the defendant on a predicate offense, our confidence in the outcome of the trial is undermined."). In *Halstead*, the jury found the defendant guilty of assault while participating in a felony but acquitted him of the underlying felony. *Id.* Because the verdicts were irreconcilably inconsistent, the court reversed the conviction. *Id.* at 816.

[2] The jury was instructed:

> For Count 1, the State must prove all of the following elements of Attempt to Commit Murder:

same is true with the lesser-included offense of assault with intent to inflict serious injury—the jury could find that Goodon did not have the specific intent to cause serious injury.[3]   This is not irreconcilable with a finding of guilt of first-degree burglary, which required finding:

> (1) On or about the 8th day of September, 2018, the defendant broke into the home of [Amanda].
> (2) The home of [Amanda] was an occupied structure as defined in [another instruction].
> (3) One or more persons were present in the occupied structure.
> (4) The defendant did not have permission or authority to break into the home of [Amanda].
> (5) The defendant did so with the specific intent to commit an assault.

---

> (1) On or about the 8th day of September, 2018, the defendant assaulted [Amanda] with a baseball bat and a knife.
> (2) By his acts, the defendant expected to set in motion a force or chain of events which would cause or result in the death of [Amanda].
> (3) When the defendant acted, *he specifically intended to cause the death of [Amanda].*
> . . .  If the State has failed to prove any one of the elements, the defendant is not guilty of Attempt to Commit Murder and you will then consider the charge of Assault with Intent to Inflict Serious Injury as explained in Instruction No. 13.

(Emphasis added.)

[3] Instruction 13, in turn, provided:
> The State must prove all of the following elements of Assault With Intent to Inflict Serious Injury:
> (1) On or about the 8th day of September, 2018, the defendant did an act which was intended to cause pain or injury or result in physical contact which was insulting or offensive, or place [Amanda] in fear of an immediate physical contact which would have been painful, injurious, insulting or offensive to her.
> (2) The defendant had the apparent ability to do the act.
> *(3) The act was done with the specific intent to cause a serious injury.*
> *. . . If the State has proved only elements 1 and 2, then the defendant is guilty of Assault.*

(Emphasis added.)  The jury found Goodon guilty of the lesser-included offense of assault.

          (6) During the incident the defendant possessed a dangerous weapon or intentionally or recklessly inflicted bodily injury on [Amanda].

The jury could have found that Goodon broke into Amanda's home with the intent to commit an assault and during the incident "recklessly inflicted bodily injury on Amanda."

     We do not agree with the defense's assertion that the jury must have found that the bat or knife were "used in such a way as to indicate the user intended to inflict death or serious injury." The jury's specific verdicts that during the burglary Goodon "was armed with," "represented that he had a dangerous weapon," and "displayed a dangerous weapon in a threatening manner" while participating in the burglary might plausibly have been a finding that a knife—here, a pocketknife—is "a device . . . designed primarily for use in inflicting . . . injury, and when used in its designed manner is capable of inflicting death." Goodon's claim of ineffective assistance of counsel fails.[4]

     *B. Hearsay.* Pretrial, Goodon objected to the admission of the VA call warning Amanda of Goodon's threats on grounds the evidence was confidential. At a pretrial hearing, the district court raised the question of whether the State was relying on an exception to the hearsay rule for the admission of Amanda's testimony regarding the VA call. The State indicated it did not believe the statements were hearsay because they were being offered for the non-hearsay

---

[4] We observe trial counsel also may have made a strategic decision not to raise the issue considering counsel's success in avoiding a jury finding that Goodon specifically intended to kill or seriously injure Amanda—particularly in light of Goodon's own statements that the responding officer "had him for breaking and entering, assault with a deadly weapon, times three, and possession of a dangerous weapon."

purpose of demonstrating its effect on Amanda and further relied upon *State v. Leonard*, 243 N.W.2d 887, 889 (Iowa 1976), for the proposition that the conveyance of a threat or warning is not hearsay. In reply, Goodon's counsel asked "the court to preclude the State from being able to introduce this phone call as a warning from a public official."

The district court took the matter under consideration and entered a written order: "The court has reviewed the *State v. Leonard* ruling and concludes in limine that the testimony of Amanda . . . which is expected to set forth the threat warning she received from the VA Hospital is not hearsay under the rationale of *State v. Leonard* and is admissible." We find no error in the court's ruling.

As in *Leonard*, the "warning" here, "even assuming the remark contained an implied assertion that [Goodon] intended to harm [Amanda], the making of the remark was relevant evidence without reference to its truth or falsity." 243 N.W.2d at 890. It was "relevant circumstantial evidence reasonably necessary to complete the whole story" of the charged crime of stalking. *See id.*; *see also* Iowa R. Evid. 5.801(c) (defining "hearsay" as "a statement that: (1) The declarant does not make while testifying at the current trial or hearing; and (2) A party offers into evidence to prove the truth of the matter asserted in the statement"). The testimony was offered to help explain Amanda's actions and reactions to Goodon's conduct. We do not find reversible error in the trial court's ruling admitting it.

*C. Assessment of Costs and Fees.* Goodon argues the district court abused its discretion in assessing court costs and $1000 in correctional fees without an appropriate consideration of Goodon's reasonable ability to pay. We agree.

In *Albright* our supreme court held:[5]

> Courts must wait to enter a final order of restitution until all items of restitution are before the court. Once the court has all the items of restitution before it, then and only then shall the court make an assessment as to the offender's reasonable ability to pay. A court should make every effort to determine an offender's financial condition as early as possible. This may require the offender filing an updated financial statement, a colloquy with the offender, or both. A court cannot impose restitution on an offender for the items subject to the offender's reasonable ability to pay if the offender does not have a reasonable ability to pay those items. Finally, any temporary, permanent, or supplemental order regarding restitution is not appealable or enforceable until the court files its final order of restitution.

925 N.W.2d at 162; *see also State v. Gross*, 935 N.W.2d 695, 701 (Iowa 2019) (discussing the two categories of victim restitution and noting court-appointed attorney fees and court costs—including correctional fees—"can be ordered only 'to the extent the offender has the reasonable ability to pay'" (citation omitted)).

The record indicates the district court did not have all items of restitution before it at the time it assessed court costs and correctional fees. Consequently, it could not make a final order of restitution. We vacate the restitution portion of the sentencing order and remand the case to the district court to order restitution in a manner consistent with *Albright*.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

---

[5] The district court did not have the benefit of *Albright* when assessing costs.