# IN THE COURT OF APPEALS OF IOWA

No. 18-0559
Filed May 15, 2019

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**JOSHUA JAMES SULLIVAN,**
      Defendant-Appellant.
_____

Appeal from the Iowa District Court for Muscatine County, Gary P. Strausser, District Associate Judge.

Joshua Sullivan appeals from his conviction on two counts of indecent exposure. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, (until withdrawal), and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Bridget A. Chambers, Assistant Attorney General, for appellee.

Considered by Vogel, C.J., Mullins, J., and Danilson, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**DANILSON, Senior Judge.**

Joshua Sullivan appeals from his conviction on two counts of indecent exposure, each in violation of Iowa Code section 709.9 (2017). He challenges the sufficiency of the evidence supporting the jury's findings of guilt and a jury instruction. Because there is substantial evidence to support both convictions and we find no error in the jury instruction given, we affirm.

**I. Background Facts and Proceedings.**

In June and July of 2017, Sullivan was working for a construction company on a project in Muscatine. Sullivan and other employees of the construction company would be in town for a week at a time and stay at a hotel in Muscatine. The lobby of the hotel has a sitting area and a public restroom. The lobby restroom is unisex, and its door opens directly out into the lobby and locks from the inside. There is no stall around the toilet; when the door is fully open, the toilet and sink are visible.

On June 5, Sullivan was staying at the hotel and had been there frequently enough that he was acquainted with Denaa Burger, who worked the 3:00 to 11:00 p.m. shift at the front desk. The evening of June 5, Sullivan approached Burger and told her that the toilet in the lobby restroom was not flushing. Because there was no maintenance person on duty after about 3:00 p.m., Burger told Sullivan she would "get to it." Before she went to check on the restroom, Burger went outside with another guest to have a cigarette. While they were outside, the guest saw Sullivan walk back into the restroom, so Burger waited about half an hour more to go check on the toilet. Burger knocked on the restroom door, waited "a few minutes" to make sure there was no one in the restroom. Getting no

response and finding the door unlocked, she walked into the restroom. Burger observed Sullivan standing by the toilet with his back to the door—he was not urinating. Burger did not see Sullivan's penis or any part of his genitalia. She quickly left the room. Later, Burger reentered the restroom to try to fix the problem. She discovered the toilet was not broken; the water to the toilet had been turned off at the valve behind the toilet. While Burger did not know who turned off the water to the toilet, no other guest had reported a problem with the toilet, and there would have been a note in the hotel log book if the maintenance person had turned off the water.

Later that same evening, Lisa Luna was working the overnight shift (11:00 p.m. to 7:00 a.m.) at the front desk. Shortly after Luna got to work, Sullivan approached her at the front desk. He told Luna the toilet in the lobby restroom was not working properly. Luna told Sullivan she was going to finish her paperwork and then she would go check on the toilet. Luna finished her paperwork and went to check on the problem. The door to the lobby restroom was "wide open," so she just walked in. Luna saw Sullivan standing over the toilet and saw his penis. At trial, Luna explained Sullivan had one hand "cuffed like he was holding himself while he was going to the bathroom." Luna was shocked and embarrassed. She turned and walked right back out of the restroom. Luna later returned to the restroom to check the toilet. She discovered the chain inside the toilet was disconnected. The chain was not broken or rusty and did not appear to be malfunctioning in any way. After the incident, Luna made a notation in the hotel's log book, describing the incident.

The next time Luna worked with Burger, Luna told her what had happened and learned that something similar had happened to Burger involving Sullivan and the lobby restroom.

Several weeks later, on the night of July 18 to 19, 2017, Audra Garcia was working the night shift at the hotel. It was Garcia's practice upon arriving at work to go first into the laundry room behind the front desk to sign in. She then would do a "walkthrough" to check on things before starting her paperwork for the night. After finishing her paperwork, Garcia would clean the lobby and then the pool area. To get to the pool, she walked by the lobby restroom. That evening, Garcia walked past the restroom on the way to clean the pool area and noticed that the restroom door was shut, the light was on, and water could be heard running. Garcia thought there might be someone in the restroom, so she did not investigate at that time. Garcia cleaned the pool area. When she returned to the lobby about an hour later, she passed the restroom again and could still hear water running. Garcia was aware of the prior incidents of Sullivan reporting problems with the lobby restroom and was hesitant to check on the running water. No one came out of the restroom.

Garcia started mopping the lobby floor and opened the restroom door part way as she mopped past it. The door was unlocked. Garcia saw a shadow, so she knew someone was in the restroom. She could hear the sink water was still running. She let the door go but the door did not close completely. No one shut the door from inside the restroom. Garcia "waited and waited" but no one came out of the restroom or said anything about being in the restroom or not to enter. Garcia went back behind the front desk and called her husband to come to the hotel and check the restroom for her because she did not want to "walk in on

anything." Garcia was concerned that she would see something she did not want to see.

Garcia's husband arrived five to ten minutes later and found her standing behind the lobby counter. She asked him to check the lobby restroom. Garcia seemed afraid to check the restroom herself and "was kind of frantic." Garcia stayed behind the lobby counter while her husband listened at the restroom door. The door was open "a crack," and Mr. Garcia could hear the sink running. He told his wife the sink water was still running and she asked him to check what was going on. Mr. Garcia returned to the restroom door and knocked on the door. He waited "a few seconds." When he did not get a response, he pulled the door open and walked into the restroom. There, he saw Sullivan sitting on the toilet masturbating. Sullivan's pants were around his ankles and he was holding a cellphone at eye level. Mr. Garcia "didn't really see" Sullivan's penis because Sullivan was sitting on the toilet and Garcia "was not gonna sit there looking at it." Mr. Garcia "saw the motion [Sullivan's] hand was doing." He could see that Sullivan's hand was on his genitals, making a "masturbating motion," and Mr. Garcia could hear the slap of Sullivan's hand hitting his thigh. Mr. Garcia confronted Sullivan. Sullivan's face got bright red and he immediately started to apologize. Sullivan did not deny that he had been masturbating and said he thought he locked the door. Mr. Garcia asked why Sullivan had not used his own restroom and Sullivan told him he had a roommate and he felt it was better to use the lobby restroom. After "exchanging words" for a few minutes, Sullivan asked Mr. Garcia to leave the restroom so that he could pull up his pants.

Surveillance video from the hotel shows Sullivan enter the lobby restroom at about 11:06 p.m. on July 18, 2017. At about 12:03 a.m., the video shows Mr. Garcia entering the lobby. The video shows Mr. Garcia approach the restroom door, knock on the door, and then step away for a minute before entering the restroom. The video then shows Sullivan leave the restroom.

Sullivan was charged with three counts of indecent exposure: count I involved the incident with Burger; count II, involving Luna; and count III, involving Garcia. The district court granted Sullivan's motion for judgment of acquittal as to the encounter with Burger. The remaining counts were sent to the jury.

Over Sullivan's objection, the court instructed the jury:

> The word exposed means to lay open to view, exhibit, display. To cause to be visible or open to view. Exposed requires the act is either in the actual presence and sight of other(s) or in such a place or under circumstances that the exhibition is liable to be seen by other(s). Exposure requires that the defendant indulged in such practices at a time and place where as a reasonable person, he knows, or ought to know, his act is open to the observation of other(s).
> Indecent exposure does not require the act(s) of the defendant involve the specific viewer be targeted by the defendant.

(Jury Instruction #10.) The jury found Sullivan guilty on counts II and III.

On appeal, Sullivan contends there is insufficient evidence to support the convictions and the trial court erred in giving Jury Instruction #10.

## II. Scope and Standard of Review.

We review a challenge to the sufficiency of evidence for correction of errors at law. *State v. Isaac*, 756 N.W.2d 817, 819 (Iowa 2008). "[W]e examine whether, taken in the light most favorable to the State, the finding of guilt is supported by substantial evidence in the record." *State v. Meyers*, 799 N.W.2d 132, 138 (Iowa 2011). "Substantial evidence exists when the evidence 'would convince a rational

fact finder the defendant is guilty beyond a reasonable doubt.'" *State v. Kelso-Christy*, 911 N.W.2d 663, 666 (Iowa 2018) (citation omitted).

"We review challenges to jury instructions for correction of errors at law. In doing so, we determine whether the challenged instruction accurately states the law and whether substantial evidence supports it. *State v. Albright*, 925 N.W.2d 144, 157 (Iowa 2019).

## III. Discussion.

Indecent exposure as alleged here is defined in Iowa Code section 709.9:

> A person who exposes the person's genitals or pubes to another not the person's spouse . . . commits a serious misdemeanor, if:
> (1) The person does so to arouse or satisfy the sexual desires of either party; and
> (2) The person knows or reasonably should know that the act is offensive to the viewer.

The crime of indecent exposure thus consists of four elements:

> (1) The exposure of genitals or pubes to someone other than a spouse . . . .;
> (2) That the act is done to arouse the sexual desires of either party;
> (3) The viewer was offended by the conduct; and
> (4) The actor knew, or under the circumstances should have known, the victim would be offended.

*State v. Isaac*, 756 N.W.2d 817, 819 (Iowa 2008) (quoting *State v. Adams*, 436 N.W.2d 49, 50 (Iowa 1989)). Sullivan argues his convictions each fail because one of the four elements was not proved. With respect to count II, Sullivan concedes his penis was exposed to Luna but he argues the evidence does not establish the exposure was "done to arouse the sexual desires of either party." As to count III, Sullivan asserts there was no "exposure" because the evidence does

not establish that Mr. Garcia actually viewed his penis. We will address these claims in reverse order.

*A. Exposure.* The supreme court has twice recently considered section 709.9's undefined term "expose." In *State v. Jorgensen*, 758 N.W.2d 830, 835 (Iowa 2008), the court reiterated that indecent exposure is "essentially a visual assault crime." After reviewing several dictionary definitions of the term "expose," the court ruled:

> [T]he first element of the crime requires the defendant to expose or "cause to be visible or open to view" his or her genitals or pubes to someone other than a spouse. As this court noted in discussing a predecessor indecent exposure statute: "The words 'indecent exposure' clearly imply that the act is either in the actual presence and sight of others, or is in such a place or under such circumstances that the exhibition is liable to be seen by others, and is presumably made for that purpose, or with reckless and criminal disregard of the decencies of life . . . . The exposure becomes 'indecent' only when [the actor] indulges in such practices at a time and place where, as a reasonable person, he knows, or ought to know, his act is open to the observation of others." . . .
>
> . . . The statute does not require the actor to be aware or have knowledge of the specific person or persons to whom he is exposing himself. The statute also does not explicitly restrict the mode of exposure. The only limitation on the first element is that the exposure or act of making visible must be to another person not the defendant's spouse.

*Jorgensen*, 758 N.W.2d at 835-36 (citations omitted).

The court again considered the meaning of the word "exposes" in *State v. Lopez*, 907 N.W.2d 112, 116 (Iowa 2018). The court again referred to the dictionary definitions, noting the term means "[t]o make visible." *Lopez*, 907 N.W.2d at 117.

> Additionally, the term *visible* in this context can mean, alternatively, "capable of being seen," "capable of being discovered or perceived," or "devised to keep a particular part or item always in full view or readily seen or referred to." *Visible, Merriam Webster's Collegiate Dictionary* (11th ed. 2014). *Open*, on the other hand, can mean

either "having no protective covering" or "completely free from concealment: exposed to general view or knowledge." *Open, Merriam Webster's Collegiate Dictionary*.

*Id.*

The *Lopez* court considered whether section 709.9 was violated if "one exposes one's genitals by transmitting an image of them via text message because the image is made visible for a recipient." *Id.* at 118. The court found the statute ambiguous and, therefore, considered "the object sought to be attained." *Id.* (quoting Iowa Code § 4.6(1)). Returning to the notion that the offense is a visual *assault*, the court observed that an assault requires either an apparent ability—meaning "a reasonable person in the defendant's position would expect the act to be completed under the existing facts and circumstances"—to cause pain or injury through physical contact or to place another in fear of immediate physical contact. *Id.* at 118 n.3 (quoting Iowa Criminal Jury Instruction 800.6).

In light of the contours of "exposure" outlined above, a jury could reasonably infer that Sullivan's action of leaving the water running in the hotel restroom with the door unlocked would bring someone to the room to investigate—as it had in the past. Sullivan failed to respond to the knock on the door. Sullivan awaited an investigator while masturbating with his pants at his ankles. If he had responded to the knock and alerted any potential investigator, there would not have been a public exposure. Thus, a reasonable jury could conclude Sullivan "exposed" his genitals because a reasonable person in his position would understand his genitalia would be capable of being seen. *See Jorgensen*, 758 N.W.2d at 836 (explaining that indecent exposure could occur where the exposure was "in such

a place or under such circumstances that the exhibition is liable to be seen by others"). We affirm the count III indecent-exposure conviction.

**B. Intent.** Sullivan admits his penis was exposed to Luna as asserted in count II. However, he argues there is not sufficient evidence that the exposure was done to arouse the sexual desires of either party. "The requisite intent to arouse or gratify the sexual desire of any person can be inferred from an accused's conduct, remarks, and all surrounding circumstances." *Id.* There was substantial evidence presented that twice on June 5, Sullivan lured female hotel staff to the public restroom reporting seemingly self-engineered problems with the toilet. He then waited in the restroom while leaving the door unlocked. The first time Burger investigated, Sullivan's back was to the door when Burger opened the door. When Luna came to investigate at a later shift, "[t]he door was wide open, so [she] just walked in." Sullivan was standing with his penis in his hand. She did not wait to determine whether his penis was erect as she was "embarrassed" and "shocked." The jury could find that Sullivan's conduct was intended to gratify his sexual desires. The jury could reasonably question why else Sullivan would walk into a restroom that he recently reported was not working and then hold his penis out waiting and leaving the door open. We conclude substantial evidence supports the conviction under count II.

**C. Jury Instruction #10.** We have reviewed Jury Instruction #10 and conclude no error was committed by giving the instruction to the jury. The instruction consists of language from *Jorgensen*, 758 N.W.2d at 835-36, which remains a correct statement of the law. Finding no error, we affirm.

**AFFIRMED.**