# IN THE COURT OF APPEALS OF IOWA

No. 18-0081
Filed November 6, 2019

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**KAMIE JO SCHIEBOUT,**
      Defendant-Appellant.
_____

Appeal from the Iowa District Court for Sioux County, Patrick H. Tott (trial and sentencing) and Jeffrey A. Neary (restitution order), Judges.

The defendant appeals her conviction and sentence for theft in the second degree. **CONVICTION AFFIRMED, SENTENCE VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.**

Mark C. Smith, State Appellate Defender, (until withdrawal) and Mary K. Conroy, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Thomas J. Ogden, Assistant Attorney General, for appellee.

Considered by Vaitheswaran, P.J., and Tabor and May, JJ.

**TABOR, Judge.**

Kamie Schiebout wrote seven checks from the Sandy Hollow Ducks Unlimited bank account, though she was not authorized to do so. The State charged her with theft in the second degree by aggregating the amounts of those checks. A jury found her guilty, and she now appeals that verdict. She contends the State failed to prove (1) that she knew the checks would not be paid and (2) that she received property, services, or money from the transactions. She also alleges the court improperly instructed the jury on aggregation. Lastly, she challenges the district court's ruling that a sheriff's reimbursement claim for $28,136 in medical aid under Iowa Code section 356.7 (2018) be listed as a civil judgment against her when she was not represented by counsel at the hearing on the claim.

Finding sufficient evidence to support her conviction, we affirm the verdict. On the medical aid, we remand for a hearing on the sheriff's claim where the defendant is afforded the right to the assistance of counsel.

## I. Facts and Prior Proceedings

The theft charges against Kamie Schiebout relate to the end of her marriage. Kamie and Matthew Schiebout separated in the spring of 2015.[1] At first they kept living under the same roof, but Kamie eventually moved into her own apartment. In April or May, Matthew closed their joint checking account. He testified: "I couldn't have her running around spending money frivolously when I can't make the [house] payments." They finalized their divorce at the end of November 2015.

---

[1] Because these parties share a surname, for clarity's sake, we will refer to them by their first names in this opinion.

As it turns out, closing the joint account did not stem Kamie's spending. Instead, she looked to a different source. For the span of a decade—during and after their marriage—Matthew belonged to a local chapter of a conservation nonprofit called Sandy Hollow Ducks Unlimited. The chapter only authorized Matthew, as treasurer, and the local president to sign checks on the organization's account at American State Bank. They used the account to fund their annual banquet, usually held in January or February. Matthew kept the Ducks Unlimited checkbook in a box in the basement of the house he had shared with Kamie.

In January 2016, Matthew received several notices from the bank of insufficient funds in the Ducks Unlimited account. Matthew explained until then he had not regularly reviewed the statements because he was busy managing a business and caring for their two sons. After learning the account was overdrawn, Matthew went to the bank and examined the check images.

Based on his examination, Matthew believed Kamie took the Ducks Unlimited checkbook from their house before she moved out and wrote checks from the account without permission. The State charged Kamie with second-degree theft by check under Iowa Code sections 714.1(6)[2] and 714.2(2)[3] (2015), as an habitual offender.

---

[2] That section provides:
> A person commits theft when the person . . . [m]akes, utters, draws, delivers, or gives any check, share draft, draft, or written order on any bank, credit union, person, or corporation, and obtains property, the use of property, including rental property, or service in exchange for such instrument, if the person knows that such check, share draft, draft, or written order will not be paid when presented.

Iowa Code § 714.1(6).

[3] At the time of Kamie's acts and when the court imposed sentence, theft of property exceeding one-thousand dollars but not exceeding ten-thousand dollars in value constituted theft in the second degree.

At the theft trial, Matthew testified the signature on the checks started with a large "K" that looked "exactly how [Kamie] writes her 'K.'" Matthew also testified Kamie was not involved with Ducks Unlimited, never had signing authority on that account, and never before wrote a check from it.

Also at trial, Crisinda Tooker, vice president at American State Bank, testified about several withdrawals from the Ducks Unlimited account. In all, between November 5, 2015, and January 2016, the Ducks Unlimited account incurred withdrawals by fourteen checks with numbers ranging from 1225 to 1399. Matthew identified check number 1225 as a valid payment from Ducks Unlimited.

The district court removed four other checks—numbers 1380, 1381, 1389, and 1393—from the jury's consideration because the State presented insufficient evidence to prove Kamie executed them or that they were issued in Sioux County.

Of the nine remaining checks, the State opted not to pursue charges based on two checks (numbers 1398 and 1399) because the bank declined to pay them. In those instances, Kamie bought items at a local clothing store in January 2016. Kamie explained to an acquaintance who worked at the store that the checks belonged to "her husband." Because the Ducks Unlimited account was overdrawn, the bank realized the checks were unauthorized and did not pay them.

Following the store clerk's testimony, the court gave this limiting instruction to the jury:

> These two checks are not part of the trial information nor are there allegations that these are included in the underlying charges, so you should not consider that evidence for any other purpose other than

that it's being offered to prove the identity of Ms. Schiebout as the author of those two checks.[4]

With those deletions, the State built its case on these seven checks:

| Check No. | Date | Payee | Amount |
|---|---|---|---|
| 1383 | Nov. 29 | Southridge | $ 87.37 |
| 1384 | Dec. 7 | Shell | $ 105.21 |
| 1386 | Dec. 12 | Walmart | $ 374.24 |
| 1387 | Dec. 14 | illegible | $ 224.46 |
| 1388 | Dec. 21 | Nearly New Town | $ 59.82 |
| 1391 | Dec. 24 | Walmart | $ 355.33 |
| 1392 | Dec. 24 | Kum & Go | $ 50.50 |
| | | Total: | $ 1256.93 |

As trial exhibits, the State offered scanned images of checks number 1383, 1384, 1387, 1388, and 1392 from the Ducks Unlimited bank statements. Handwritten at the top of two of those checks is Kamie's phone number.

Images of check numbers 1386 and 1391, both written to Walmart, were unavailable as exhibits because Walmart processed them as ACH withdrawals.[5] Tookers explained some businesses convert paper checks into electronic transfers directly from the check-writer's account. Those businesses typically give the check back to the writer and do not convey it to the bank or retain a copy.[6] Tookers could only tell from the bank statements when, how much, and to whom those checks were written. The bank records did not identify who signed the checks.

---

[4] The State also presented evidence from Eric Vandehoef, another staff member at American State Bank. In early 2016, the banker was aware of unauthorized activity on the Ducks Unlimited account and noted Kamie was writing checks from the account. When he raised the concern with Kamie, she claimed to have accidentally grabbed the wrong checkbook. Vandehoef was unsure of the exact date of their conversation.

[5] "ACH stands for 'Automated Clearinghouse,' which is an electronic payment delivery system that processes electronic credit and debit transfers." *Campbell v. State*, 01-18-00214-CR, 2019 WL 2180379, at *1 (Tex. App. May 21, 2019).

[6] The businesses that accepted check numbers 1389 and 1393 (which the court excluded from the jury's consideration) also processed them as ACH withdrawals.

To fill that gap, the State called a Walmart loss-prevention officer, who provided law enforcement with receipts for two transactions with Ducks Unlimited. The receipts showed the buyer wrote Walmart checks with numbers 1386—dated December 14—and 1391—dated December 24. The loss prevention officer found surveillance video and photographs matching the timestamp on those transactions. That video documented Kamie paying for goods when the system generated the receipts. And photographs show Kamie wheeling a loaded shopping cart out of the door on both occasions.

After the close of evidence, the jury found Kamie guilty of theft in the second degree. The jury filled in the verdict form, as follows:

We, the jury, find the following verdict on the questions submitted to us:
Question No. 1: Did the Defendant make or deliver checks on the account of Sandy Hollow Ducks Unlimited without permission or authorization?
Answer "yes" or "no."
ANSWER: __yes__
(If your answer is "yes", then answer Question 2. If you answer is "no", then stop.)

Question No. 2: In executing the 7 checks at issue herein were the Defendant's actions part of a single scheme or plan?
Answer "yes" or "no".
ANSWER: __yes__
(If your answer is "yes", then answer Question 3. If you answer is "no", then skip Question No. 3 and proceed to Question No. 4 through No. 10.)

Question No. 3: We, the jury, find the defendant Kamie Jo Shiebout:
As to Count I, Theft in the Second Degree
__X__ Guilty of the crime of Theft in the Second Degree
_____ Guilty of the crime of Theft in the Third Degree
_____ Guilty of the crime of Theft in the Fourth Degree
_____ Guilty of the crime of Theft in the Fifth Degree
_____ Not Guilty
Upon answering Question No. 3, stop.

If the jury had answered "no" to Question No. 2, it would have went to Questions 4 through 10—each of which asked whether Kamie was guilty of theft based on the seven individual checks.

The district court sentenced Kamie to an indeterminate prison term of fifteen years, as an habitual offender. The court found Kamie did not have the reasonable ability to pay certain items of restitution and waived court-appointed attorney fees, court costs, and correction fees.

About a month later, the Sioux County Sheriff's Office filed a claim for $735 for Kamie's twenty-one-day jail stay and for $28,136.31 in medical aid provided to Kamie while she was a prisoner. The claim sought "court approval for payment as restitution." Following a hearing where Kamie was unrepresented, the court decided Kamie was not reasonably able to pay the room-and-board fees. But it found the medical aid was "not subject to a reasonable ability to pay analysis" and ordered Kamie to pay that amount as a civil judgment.

Kamie appeals the conviction and sentence.

## II. Scope and Standards of Review

We review challenges to the sufficiency of the evidence for correction of legal error; we affirm if substantial evidence supports the verdict. *State v. Benson*, 919 N.W.2d 237, 241 (Iowa 2018). Substantial means evidence that would convince a rational jury that the defendant is guilty beyond a reasonable doubt. *Id.* We view the evidence in the light most favorable to the verdict, entertaining all reasonable inferences that may be fairly drawn from the record. *State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017).

By contrast, we review Kamie's claims of ineffective assistance de novo. *See State v. Ondayog*, 722 N.W.2d 778, 783 (Iowa 2006). Kamie must show trial counsel failed to perform an essential duty and prejudice resulted. *See Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Often we preserve ineffective-assistance claims for possible postconviction-relief actions.[7] *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012).

We review questions of restitution for correction of legal error. *See State v. Albright*, 925 N.W.2d 144, 158 (Iowa 2019). Our task is to decide whether the district court properly applied the statutes governing claims of restitution. *Id.*

## III. Analysis

## A. Sufficiency of the Evidence

To find Kamie guilty of second-degree theft, the jury had to find

1. On or between November 5, 2015 and December 31, 2015, the Defendant did make or deliver to local organizations or businesses in Sioux County checks in an amount greater than $1,000 but less than $10,000.
2. The checks were drawn on a bank.
3. The Defendant received property, services, or money in exchange for the checks.
4. The Defendant knew at the time she gave the checks to local organizations or businesses that they would not be paid by the bank because the Defendant was not an authorized signer on the account.

On appeal, Kamie challenges the third and fourth elements—contending the State did not prove (3) she received any property, services, or money from the

---

[7] Our supreme court decided recent amendments to Iowa Code section 814.7 (prohibiting resolution of ineffective-assistance-of-counsel claims on direct appeal) apply only prospectively and do not affect cases, like this one, pending on July 1, 2019. *See State v. Macke*, 933 N.W.2d 226, 228 (Iowa 2019).

transactions and did not prove (4) she knew the bank would not pay the checks when she presented them to the businesses.

In its motion for judgment of acquittal, the defense contested the fourth element (knowledge the checks would not be honored) but not the third element (receipt of property, services, or money). "To preserve error on a claim of insufficient evidence for appellate review in a criminal case, the defendant must make a motion for judgment of acquittal at trial that identifies the specific grounds raised on appeal." *State v. Truesdell*, 679 N.W.2d 611, 615 (Iowa 2004). Recognizing trial counsel's omission, Kamie asks us to consider the receipt element under the rubric of ineffective assistance of counsel. We will do so.

We start with the preserved claim. Kamie contends the State failed to offer substantial evidence that she knew the bank would not pay the checks she wrote on the Ducks Unlimited account. She points to the fact that bank *did* honor the checks or, in the case of the ACH withdrawals, completed the electronic transfers immediately.

The State counters it is enough that Kamie knew she lacked authority to write checks from the account. In support of its position, the State cites Iowa Code section 714.1(6)(b): "Whenever the drawee of such instrument has refused payment because the maker has no account with the drawee, the court or jury may infer from such fact that the maker knew that the instrument would not be paid on presentation."[8] That provision echoes Model Penal Code section 224.5 (Am. Law Inst. 1980), which advises "in any prosecution for theft committed by means of a

---

[8] We recognize here the drawee-bank did not refuse payment for the seven checks at issue, so the statutory inference may not apply.

bad check, an issuer is presumed to know that the check . . . would not be paid, if . . . the issuer had no account with the drawee at the time the check . . . was issued." *See State v. Hogrefe*, 557 N.W.2d 871, 879 (Iowa 1996) (discussing "interplay of theft by deception laws and theft by check laws" in Model Penal Code).

After a close reading of section 714.1(6), we find the State's proof satisfied the knowledge element here. The statute holds a person liable for theft by check if she "knows that such check" will not be paid "when presented." The time for probing what the defendant knew is when she presents the check, not when the payee processes it. Because the evidence established Kamie's knowledge that Ducks Unlimited had not authorized her to sign checks on its account,[9] the jury could infer "the criminal intent of the promisor as check writer." *See id.* at 878.

The bank's conduct in mistakenly honoring most of the checks she wrote on the Ducks Unlimited account does not matter. Kamie cannot benefit from the bank's inattentiveness. The jury could conclude that, when she signed the checks, she knew she lacked authority to spend money in the Ducks Unlimited account and that the bank would be aware of that fact. Viewed in the light most favorable to the State, and allowing reasonable inferences the jury could make, we find substantial evidence supports the knowledge element of theft by check.

We turn next to the unpreserved claim. Kamie contends her trial counsel was ineffective in not arguing the State failed to prove she received property,

---

[9] Matthew testified that before November 2015 Kamie had never written any checks on the Ducks Unlimited account. In fact, her only connection with the organization was to attend the annual banquet with Matthew. In addition, banker Vandehoef testified that when he advised Kamie in early 2016 that she was not authorized to write checks on that account, she did not argue; instead she claimed to have "grabbed the wrong checkbook."

services, or money in return for five of the seven checks at issue (numbers 1383, 1384, 1387, 1388, and 1392). Other than the photographs showing Kamie pushing carts of merchandise from Walmart, the State produced no physical evidence of what she received in exchange for the checks. The receipts from her Walmart purchases (check numbers 1386 and 1391) are for household items such as trash bags, curtain rods, and coffee creamer. Although four of the other five checks appear to be written to businesses,[10] Kamie argues "it is just as likely that the checks were a donation to different places as it is that Schiebout actually received property or services."

The State responds:

> The five checks that [Kamie] challenges were written to local retailers in amounts that suggest [Kamie] was paying a price for goods, not giving a donation. Jurors can call on their common knowledge to tell them that [Kamie] was not donating money to Kum & Go, nor was she donating exactly $59.82 to Nearly New Town.

While the State's evidence was not overwhelming, we conclude the jury could reasonably infer Kamie received "property, services, or money" in exchange for all seven checks. The theft-by-check statute requires proof a person obtained property or "the use of property" or service in exchange for checks she knew would not be paid. *See* Iowa Code § 714.1(6). We read the phrase "use of property" as encompassing more than the purchase of goods or services.[11] In that vein, the district court included the term "money" in the marshaling instruction, which cleared

---

[10] The payee on check number 1387 is illegible. And although South Ridge Travel Plaza, Shell, Kum & Go, and Nearly New Town are businesses in Sioux County, the State did not present evidence that Kamie received goods or services from them in return for the checks on the Ducks Unlimited account.

[11] "Property" means "anything of value," including tangible and intangible personal property. Iowa Code § 702.14; *see also* Model Penal Code § 223.0(6).

the way for the jury to find Kamie guilty if she spent funds belonging to Ducks Unlimited that she had no right to use. As soon as Kamie passed the checks to third-party payees and those payees submitted the checks to the bank for payment, she obtained the use of property belonging Ducks Unlimited.[12] It doesn't matter if she used that property to purchase gasoline at Kum & Go or made a contribution to an unidentified payee in the amount of $224.46. Viewing the evidence in the light most favorable to the State, we find sufficient proof Kamie obtained something of value from delivering the seven checks on the Ducks Unlimited account. Because the record contained substantial evidence supporting this element, Kamie did not show trial counsel was ineffective in the motion for judgment of acquittal. *See Albright*, 925 N.W.2d at 157.

## B. Jury Instruction on Aggregate Value

Under the State's theory of the case, the jury was allowed to aggregate the amounts of the seven checks Kamie wrote on the Ducks Unlimited account, treating her related acts as a single theft to determine the degree of the crime. *See* Iowa Code § 714.3(2).[13]

On appeal, Kamie contends her attorney was remiss in not objecting to a lack of clarity in the jury instructions on aggregation. She argues "the jury was

---

[12] In relation to property, the Model Penal Code defines "obtain" as "to bring about a transfer or purported transfer of a legal interest in the property, whether to the obtainer or another." Model Penal Code § 223.0(5).

[13] The jury instruction provided:

> If money or property is stolen . . . from different persons by two or more acts which occur in approximately the same location or time period, or from different locations by two or more acts within a thirty-day period, so that the thefts are attributable to a single scheme, plan, or conspiracy, these acts may be considered a single theft and the value may be the total value of all the property stolen.

allowed to add together any checks it believed were part of a single scheme in order to reach the threshold of over $1000 required to convict" her of theft in the second degree. The State responds that the district court adequately informed the jury that it was deciding Kamie's guilt based on the seven checks listed on the verdict form. The State contends Kamie cannot show she was prejudiced by counsel's failure to request a more specific jury instruction.

We agree with the State on the prejudice prong. The court instructed the jury on the elements of second-degree theft consistent with sections 714.1(6) and 714.2(2). The instructions also defined "single theft" consistent with section 714.3(2). On the verdict form, the jurors responded "yes" to the question: "In executing the 7 checks at issue herein were the Defendant's actions part of a single scheme or plan?" Questions four through ten on the verdict form listed the check numbers and amounts of those seven checks. Although the jurors did not need to answer those questions, the verdict form provided them with the information they needed to aggregate the amounts to determine the degree of theft.

Additional clarification came during closing arguments. The prosecutor asked the jurors to "look at those seven checks" and aggregate the amounts to reach a guilty verdict on second-degree theft. On the flipside, defense counsel urged the jury to find "no scheme" and, at most, to consider the amounts of each check as separate offenses. On this record, Kamie cannot show that but for her attorney's failure to ask for an additional jury instruction on aggregation, the result of the proceeding would have been different. *See State v. Hill*, 449 N.W.2d 626, 629 (Iowa 1989) (finding more precise jury instruction would not have created a "reasonable probability the jury would have reached a different verdict").

**C. Sheriff's Reimbursement Claim for Medical Aid**

In her final issue, Kamie urges us to reverse the ruling on the sheriff's claim for reimbursement of $28,136 in medical aid under section 356.7. Using that provision, the county sheriff may charge a prisoner for room and board and "for any medical aid provided to the prisoner under section 356.5." Iowa Code § 356.7(1). Section 365.5 requires the keeper of each jail to furnish prisoners with necessary medical aid. The sheriff may file a reimbursement claim with the clerk of the district court with the amount of medical aid the person owes. *Id.* § 365.7(2)(h). The claim should also reflect if the sheriff "wishes to have the amount of the claim for charges owed included within the amount of restitution determined to be owed by the person." *Id.* § 365.7(2)(i).

The sheriff's reimbursement request must be approved by the court before it is paid. *Id.* § 356.7(3); *State v. Abrahamson*, 696 N.W.2d 589, 592 (Iowa 2005) (holding "shall approve" language in section 356.7(3) "does not mean that the court must rubber-stamp a claim"). Once the court approves the reimbursement request, the sheriff "may choose to enforce the claim in the manner provided in chapter 626." Iowa Code § 356.7(3); *Abrahamson*, 696 N.W.2d at 591 (explaining claims under 356.7(3) "may be enforced in two ways: as a judgment in the traditional sense, under Iowa Code chapter 626, or as part of a restitution plan under chapter 910").

Here, the sheriff's office did not signal it was choosing enforcement of the claim as a civil judgment. Rather, the request sought court approval for payment of the claim as restitution. The court set the request for hearing on March 5, 2018. When Kamie—whose public defender withdrew in January—did not appear for the

hearing, the court continued the matter for two weeks. On March 19, the state appellate defender asserted the district court retained jurisdiction over the restitution matter but the court would need to appoint different counsel. The court appointed new counsel and reset the hearing for April 16. That appointed attorney moved to withdraw, contending the matter was "not payable from the indigent defense fund." The court approved the motion to withdraw. The court again continued the hearing until April 30, 2018.

On that date, the Sioux County Attorney appeared for the sheriff and Kamie appeared as a self-represented litigant. The court placed Kamie under oath and asked her to give "a brief overview of what happened with regard to causing these extra medical bills." Kamie explained her injuries to the court:

> I was arrested, I believe it was November 21 or 22. And when I was taken into custody, I requested mental health help. And then about a week after being in the Sioux County jail, I put in a written request for mental health. And it was a week after that where—because I was mentally unstable, I tried to hang myself from the second floor railing and the sheet broke and . . . I landed on my knees on the concrete. I was transferred to Sioux Falls Sanford Hospital and had immediate surgery. They almost gave me a blood transfusion because I lost so much blood inside my legs. . . . [M]y knee cap split, right femur, and the left knee cap shattered. And there was a small fracture.

In a May 7, 2018 order, the district court cited sections 356.7 and 910.2(1) and then stated: "Nowhere in this statutory language is the reasonable ability to pay provision stated as applicable to the reimbursement sought by a Sheriff for the payment of medical expenses/aid provided by the Sheriff to an incarcerated individual." So the court decided the sheriff's request for medical-aid reimbursement was not subject to a reasonable-ability-to-pay analysis. The court

further held: "The amount of $28,136.31 shall be listed as a civil judgment against the Defendant and not as criminal restitution."

On appeal, Kamie argues she had a right to counsel at the hearing and did not validly waive that right. She also argues the district court erred in converting the sheriff's claim into a civil judgment rather than criminal restitution when the sheriff did not ask to pursue the claim under chapter 626.

The State concedes the medical aid is subject to the reasonable-ability-to-pay requirement if it is treated as restitution under section 910.2. *But see State v. Gross*, No. 18-0690, 2019 WL 1752670 (Iowa Ct. App. April 17, 2019) ("For a civil judgment, Gross is 'afforded the same protections as other civil judgment debtors.' *See State v. Dudley*, 766 N.W.2d 606, 623 (Iowa 2009). This does not include a determination the defendant is reasonably able to pay the amount due, as in restitution proceedings."). The State also concedes Kamie was entitled to counsel at the hearing under *State v. Alspach,* 554 N.W.2d 882 (Iowa 1996), and *State v. Blank,* 570 N.W.2d 924 (Iowa 1997).

We agree Kamie was entitled to the assistance of counsel at the hearing on the sheriff's reimbursement request. We vacate the May 7 order and remand for further proceedings consistent with *Abrahamson*, 696 N.W.2d at 592 and *Albright*, 925 N.W.2d at 160–61.

**CONVICTION AFFIRMED, SENTENCE VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.**