# IN THE COURT OF APPEALS OF IOWA

No. 18-2041
Filed July 22, 2020

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**KYLE ANTHONY SADLER,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Poweshiek County, Lucy J. Gamon, Judge.

Kyle Sadler appeals convictions for murder in the second degree, assault with a dangerous weapon, and leaving the scene of an accident. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Peter Stiefel, Victor, for appellant.

Thomas J. Miller, Attorney General, and Genevieve Reinkoester, Assistant Attorney General, for appellee.

Heard by Tabor, P.J., and May and Greer, JJ.

**TABOR, Presiding Judge.**

A jury found Kyle Sadler guilty of murder in the second degree and three counts of assault with a dangerous weapon. The jury also found Sadler guilty of operating while intoxicated (OWI) and four counts of leaving the scene of an accident. The verdicts followed the State's evidence showing Sadler, driving a flatbed truck, chased a Mustang at high speeds down a gravel road. Sadler's truck struck the back of that car, ejecting the driver. The driver died and three passengers sustained serious injuries.

On appeal, Sadler contends the State offered insufficient evidence to show he intentionally struck the Mustang or that he acted with malice aforethought, elements of the murder charge. He also argues the State failed to prove he had the specific intent necessary for the assault counts. Beyond contesting the sufficiency of the evidence, Sadler claims his trial counsel was ineffective in handling two jury instructions. Finally, Sadler contends the district court erred in failing to merge the four counts of leaving the scene of an accident. We grant relief on the final issue only.

## I. Facts and Prior Proceedings

An ongoing feud between two factions of young people, in their early twenties, led to a fatal car crash in June 2017. The hostility centered on Shaden Wyatt and his unrequited feelings for Hannah Sisco. Wyatt threatened Sisco's associates Ty Johnson and Jarrett Mitchell.[1] Sadler allied himself with Wyatt, his housemate and

---

[1] Jarrett testified he also goes by the last name Bristow. But we will call him Mitchell in this decision.

long-time friend. Fatefully, the parties who instigated the feuding were only tangentially touched by its wake.

Roughly a week before the deadly collision, Wyatt argued with Sisco and threatened to kill Johnson. A few days after that threat, Wyatt chased Sisco in his yellow S-10 pickup truck at high speeds. Sisco recalled Sadler riding in the back of Wyatt's pickup holding a baseball bat.[2] In the same time frame, Sisco received a "snap chat" from Wyatt's phone saying, "the graveyard's close." Sisco viewed the message as a death threat.

Then one evening in early June, Sisco, Mitchell, and Johnson—along with their friends Riley Ely, Robert Dimit, Acacia Torbensen, and Amanda Bristow— gathered at Dylan Sheet's house. Witnesses testified Mitchell called Wyatt to say, "Stop harassing Ty and Hannah." Unrepentant, Wyatt told Mitchell "he was going to slit his throat." The two decided they would meet that night to settle the matter.

So the group of eight people at Sheet's house loaded into three cars and drove to Wyatt's residence near Malcom, Iowa to confront him. Wyatt lived with his friend Sadler in a house about six miles down a gravel road. Ely drove his Mustang; his passengers were Sheets, Dimit, and Torbensen.

Most of the group expected a face-off at Wyatt's house. But according to their testimony, only a few envisioned the violent brawl that ensued. As Ely's car arrived, Wyatt appeared from behind a bush, crashing a baseball bat into the windshield. In response, Ely left his car and began fighting Wyatt. Soon Mitchell,

---

[2] Sadler insists he was not in the vehicle with Wyatt and that he heard about this chase from his twin brother.

Dimit, and Sadler joined in. Most of the testimony puts Ely, Mitchell, Dimit, Sadler, and Wyatt in the fray—the involvement of Sheets and Johnson is less clear.[3]

According to Sadler's testimony, he tried to get Mitchell and Ely off Wyatt. But when Mitchell warned—"you want some of this too"—Sadler backed off. Sadler testified he decided on a different tact to break up the fight: "I was going to push the brush pile with the S-10 pickup, but instead it went over it a little bit and got stuck." The State's witnesses perceived Sadler's intent as more menacing: "He tried to aim towards Shaden and Jarrett and Riley with the truck." They insisted if Sadler had not become stuck, the yellow S-10 truck would have hit them.

After the brush pile stopped the truck's momentum, someone yelled they would call police. The State's witnesses couldn't recall who said it. But Sadler and Wyatt testified it was Sadler who threatened to "call the cops." At the mention of police, the visitors left in their cars. The time was about 10:30 p.m. Ely's Mustang was the last car to leave with passengers Sheets, Dimit, and Torbensen. A few minutes after Ely departed, Sadler climbed into a red Chevy Silverado flatbed pickup truck and chased them.[4] Sadler did so even after Wyatt and Loftin advised him not to go.

Ely had been driving for a couple of miles before his passengers noticed headlights approaching quickly from behind. Soon after, Sadler's truck crested the hill. The truck veered toward the ditch. The truck then corrected and rammed the Mustang's rear end, sending it into the ditch. Passenger Sheets testified: "We

---

[3] Sadler and Wyatt asserted Sadler had limited involvement.
[4] Garrett Loftin, a neighbor, had driven that truck to Wyatt's residence on the night of the fight and left the keys in the ignition.

rear-ended so hard that it blew the back window out of the car, and the trunk lid flew off. We went into the ditch on the east side of the road." Flames slowly engulfed the Mustang. The impact ejected Ely, who died at the scene. The other three passengers were seriously injured.

Sadler's truck also went into the ditch. After the crash, several witnesses saw him run from the scene.[5] Sadler testified he left because he did not have his cell phone with him. He reportedly knocked on a neighbor's door to ask for help but received no answer. Sadler testified when he got back home, he still couldn't find his cell phone and the house had no landline. Sadler said he didn't go back to the scene because he feared someone would attack him.

A few hours after the collision, Deputy Steve Kivi found Sadler sleeping at his home. At first, Sadler said he chased the Mustang because "he was mad" that "these guys were beating the shit out of his buddy Shaden." Sadler told Deputy Kivi that Ely applied his brakes, causing Sadler to rear-end the Mustang. When asked about leaving the scene, Sadler told the deputy that he was scared and did not know what to do.

Sadler's explanation varied a bit as time went on. Later that summer, Deputy Kivi talked with Sadler again. This time, Sadler said he pursued the cars because "he was trying to get a license plate number" so he could call the sheriff. The deputy interviewed Sadler a third time in September. Sadler explained he chased Ely's car because he didn't know what to do after the fight, he had never

---

[5] Mitchell recalled seeing Sadler and Wyatt at the collision. But the other witnesses only saw Sadler leave the scene. Sadler and Wyatt denied Wyatt was in the truck at the time of the collision.

been in that situation before, and he had "adrenaline running" through him. When asked about leaving the scene, Sadler said he left because Mitchell threatened to kill him. At trial, Sadler testified that when he climbed into the flatbed he was "sad and upset with what just happened." He said his intent was to "catch up to the guys and ask them why they had done that." He also intended to say, "they were never allowed back there after what they had just done."

Sadler estimated he was driving between 50 and 60 miles per hour as he tried to catch up with the Mustang. He said he didn't expect Ely's car to be so close when he crested the hill. Sadler remembers seeing what he thought might be brake lights. But he explained the dust from the gravel limited the visibility. Sadler insisted there was "not enough time" to brake before colliding with Ely's car.

Accident reconstruction experts painted a different picture. Iowa State Patrol Troopers Matt Schwenn and Korey Reule estimated the pre-impact speed of Sadler's truck was 90 miles per hour, while the Mustang was traveling at about 60 miles per hour. The troopers determined there were no "pre-impact marks as far as braking or skid marks" from either vehicle. According to the State's witnesses, Ely was not driving unsafely but was following another car at the time.

Trooper Reule conducted a follow-up investigation in September. Sadler admitted drinking three bottles of beer before the collision. A urine sample taken from Sadler after the crash also tested positive for methamphetamine.[6]

In January 2018, the State charged Sadler with nine counts stemming from the June collision. The charges included second-degree murder in violation of

---

[6]Sadler testified he used methamphetamine that morning and was no longer feeling its effects that evening.

Iowa Code section 707.3 (2017), three counts of assault with a dangerous weapon in violation of section 708.2(3), four counts of leaving the scene of an accident in violation of section 321.261, and OWI in violation of section 321J.2.[7] The case proceeded to trial in August 2018. The jury found Sadler guilty of all nine counts after less than four hours of deliberation.

In November 2018, the district court entered judgment on all counts. The court sentenced Sadler to a term not to exceed fifty years (with a seventy percent mandatory minimum) for the murder, running the other terms concurrently. Sadler filed a notice of appeal that same day.

## II. Analysis

### A. Sufficiency of the Evidence

We review sufficiency challenges for correction of errors at law. *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017). We uphold guilty verdicts if they are supported by substantial evidence. *Id.* Substantial evidence would convince a rational trier of fact that the defendant is guilty beyond a reasonable doubt. *Id.* We view all relevant evidence in the light most favorable to the State. *Id.* If evidence raises only suspicion, speculation, or conjecture, it is not substantial. *State v. Howse*, 875 N.W.2d 684, 688 (Iowa 2016). We consider all evidence in the record, not just the evidence supporting guilt. *Tipton*, 897 N.W.2d at 692 (citing *State v. Torres*, 495 N.W.2d 678, 681 (Iowa 1993)).

---

[7] Sadler does not challenge the OWI conviction on appeal.

### 1. Murder in the Second Degree

To convict Sadler of second-degree murder, the State needed to prove beyond a reasonable doubt these elements:

> 1. On June 8, 2017, [Sadler] used his vehicle to intentionally strike Riley Ely's vehicle.
> 2. Riley Ely died as a result of [Sadler] intentionally striking Riley Ely's vehicle.
> 3. [Sadler] acted with malice aforethought.

Sadler contests the first and third elements. He contends the State didn't prove he intentionally struck Ely's vehicle.[8] And he also argues the record lacks sufficient evidence of malice aforethought to support the verdict of murder in the second degree.

We start with the first element: did the State present enough proof for the jury to find Sadler intentionally struck Ely's vehicle? Second-degree murder requires proof of a general criminal intent, rather than the specific intent to kill required for first-degree murder. *See State v. Klindt*, 542 N.W.2d 553, 555 (Iowa 1996). In other words, the State had to prove the death was not accidental. *See Anfinson v. State*, 758 N.W.2d 496, 504 (Iowa 2008).

Promoting his accident defense, Sadler points to evidence that the visibility was poor and Riley's vehicle may have been slowing down. Sadler also contends

---

[8] Sadler raises this issue as ineffective assistance because defense counsel concentrated on the element of malice aforethought when moving for judgment of acquittal. But counsel also argued, "This is just as easily explained as being a situation where an unfortunate motor vehicle accident occurred." Given this statement, we conclude it was "obvious and understood" by opposing counsel and the district court that Sadler was challenging the intentional nature of the collision. *See State v. Albright*, 925 N.W.2d 144, 150 (Iowa 2019) (discussing exception to error-preservation rule). Thus, we will address both elements as preserved error.

his substance use may have slowed his reaction time. Finally, he highlights his own testimony that he did not mean to strike the Mustang.

Determining the plausibility of Sadler's explanations was the jury's function. *See State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006). Viewing the record in the light most favorable to the State, we find substantial evidence to support the general intent element. The sheer force of the collision undermined Sadler's claim of accident. Sadler crashed the flatbed truck into the back of the Mustang with enough velocity to smash the rear window and eject the driver. Troopers estimated Sadler was driving thirty miles per hour faster than Ely and detected no marks to suggest braking at the scene. The physical evidence supports the finding that Sadler intentionally struck Ely's vehicle.

Beyond the physical evidence, Sadler's conduct both before and after the collision reveal a general criminal intent. Sadler and Wyatt were allies who harbored animosity toward Ely and his companions. Before the collision, Ely and seven others showed up at the house Sadler shared with Wyatt. As they fought, Ely's faction outnumbered Wyatt. To protect his friend, Sadler tried to drive a pickup into the group, but a brush pile prevented him from doing so. After seeing Wyatt was injured, Sadler—now enraged—raced after Ely's car in a different pickup truck, despite Wyatt telling him not to go. The jury could believe the resulting collision was not accidental. After the collision, Sadler ran away without stopping to check on anyone. The jurors could have concluded such callous and evasive behavior did not fit with Sadler's claim of accident. *See State v. Wilson*, 878 N.W.2d 203, 214 (Iowa 2016) (explaining immediate flight may be relevant to show consciousness of guilt).

Having found substantial evidence to support the jury's determination that Sadler intentionally struck Ely's vehicle, we turn to the element of malice aforethought. The court instructed the jury:

> "Malice" is a state of mind which leads one to intentionally do a wrongful act to the injury of another out of actual hatred, or with an evil or unlawful purpose. It may be established by evidence of actual hatred, or by proof of a deliberate or fixed intent to do injury. It may be found from the acts and conduct of the defendant, and the means used in doing the wrongful and injurious act. Malice requires only such deliberation that would make a person appreciate and understand the nature of the act and its consequences, as distinguished from an act done in the heat of passion.
> "Malice aforethought" is a fixed purpose or design to do some physical harm to another which exists before the act is committed. It does not have to exist for any particular length of time.

Sadler argues the State presented insufficient evidence that he acted with malice aforethought on the night of the crash. He returns to his testimony that he was chasing Ely only to deliver a warning not to come back. And the dusty conditions contributed to his inability to stop in time to avoid rear-ending the Mustang. As noted above, the jury was free to reject Sadler's version of events. *See State v. Banes*, 910 N.W.2d 634, 639 (Iowa Ct. App. 2018); *see also State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993) (reiterating jury's function is to sort out evidence and "place credibility where it belongs" (citation omitted)).

The evidence undergirding Sadler's intent to collide with Ely's vehicle likewise exposes Sadler's malice aforethought. Sadler backed his friend Wyatt in the ongoing feud with Ely's group. In recent weeks, Wyatt had made serious threats toward members of that group. Foreshadowing the night of the crash, a few days earlier Wyatt had chased Sisco in his pickup at high speeds, possibly with Sadler as his passenger. And fresh in Sadler's mind at the time of the

collision, Wyatt had taken a beating in the brawl with Ely's group in their yard. After Sadler failed in trying to ram them with the S-10 pickup, the record shows he chased them in the flatbed to finish what he started.

Plus, Sadler's evolving accounts given Detective Kivi for why he chased Ely were more evidence from which the jurors could infer Sadler's guilty knowledge. *See State v. Cox*, 500 N.W.2d 23, 25 (Iowa 1993) (holding false story told by the accused to explain a material fact signifies guilt). At first, Sadler acknowledged he was "mad" when he chased the Mustang. Later, he claimed he wanted to get a license plate number, though he knew that it was Ely's car. Then, Sadler attributed his conduct to "adrenaline running" through him. And finally, at trial, Sadler testified he chased them because he was "upset" and intended to tell them that they were never welcome back. The jurors could have found that Sadler was backtracking from an initial admission of malice.

The trial record, when viewed in the light most favorable to the State, contains sufficient evidence for a rational jury to conclude beyond a reasonable doubt Sadler acted with malice aforethought.

### 2. Assault with a Dangerous Weapon

Sadler next challenges the sufficiency of the evidence for the three assault convictions. He contends the State failed to prove he had the specific intent to cause pain or injury or place the occupants of Ely's vehicle in fear of immediate contact that would be painful, injurious, insulting, or offensive. *See* Iowa Code § 708.1(2).

To prove assault with a dangerous weapon, the State must show:

1. On June 8, 2017, [Sadler] did an act which was actually intended to cause pain or injury or result in physical contact which was insulting or offensive or place [the victim] in fear of an immediate physical contact which would have been painful, injurious, insulting or offensive to [the victim.]

2. [Sadler] had the apparent ability to do that act.

3. [Sadler] used or displayed a dangerous weapon in the assault.

Assault with a dangerous weapon is a specific intent crime. *See State v. Fountain*, 786 N.W.2d 260, 265 (Iowa 2010). Specific intent means not only being aware of doing an act and doing it voluntarily, but also doing it with a specific purpose in mind. *See State v. Benson*, 919 N.W.2d 237, 247 (Iowa 2018). Because specific intent is seldom capable of direct proof, the State may prove it by circumstantial evidence and reasonable inferences drawn from that evidence. *State v. Walker*, 574 N.W.2d 280, 289 (Iowa 1998). The jury may presume "a person intends the natural consequences of his intentional acts." *State v. Chatterson*, 259 N.W.2d 766, 770 (Iowa 1977).

To contest his assault convictions, Sadler revisits his sufficiency arguments on the murder charge, insisting he did not intend to strike the Mustang. He contends because of the testimony suggesting poor visibility, the record contained "insufficient evidence that Sadler had the specific intent to get close enough to [Ely's] vehicle to put the occupants in fear of immediate physical contact that would be painful, injurious, insulting, or offensive." Sadler also argues that even if he intended to collide with Ely's vehicle, he could not have had the specific intent to

injure or incite fear in Sheets, Dimmit, or Torbensen because the record lacked proof that he knew the identity of the passengers.[9]

We reject Sadler's argument that the State did not offer substantial evidence of his specific intent to carry out the assaults. As we held above, a reasonable jury could find from the record that Sadler intended to strike the Mustang and acted with malice aforethought. Sadler harbored animosity toward the group leaving his house. He chased them in a flatbed pickup at high speeds. The record supports that Sadler knew Ely was driving the Mustang and had passengers. It was reasonable for the jurors to infer from Sadler's conduct that he intended to injure the passengers or at least place them in fear of offensive contact. We decline to disturb the jury's verdicts.

## B. Ineffective Assistance of Counsel

Left to resolve are Sadler's two claims that his counsel was careless in handling the jury instructions.

We review claims of ineffective assistance de novo because they are based in the Sixth Amendment. *State v. Albright*, 925 N.W.2d 144, 151 (Iowa 2019). For Sadler to prevail, he must show counsel failed to perform an essential duty and

---

[9] Sadler did not raise this argument in moving for judgment of acquittal, so we question error preservation. Nonetheless, we find Sadler did not need to know the identities of Ely's passengers to commit assault. His general knowledge of passengers in the vehicle sufficed. *See Jones v. State*, 73 A.3d 1136, 1143 (Md. Ct. Spec. App. 2013) (rejecting argument that defendant must know identity of assault victim); *Commonwealth v. Fierst*, 620 A.2d 1196, 1202 (Pa. Super. Ct. 1993) (in assault case, holding defendant only needed to know someone was in oncoming vehicle, not their particular identity); *see also State v. Elmi*, 207 P.3d 439, 444 (Wash. 2009) (affirming multiple assault convictions where defendant intended to harm one person by firing multiple shots into their house, but more people were present).

prejudice resulted. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). We presume counsel performed their duties competently, and then we measure their performance against the standard of a reasonably competent practitioner. *Albright*, 925 N.W.2d at 151. Even if Sadler proves the breach-of-duty prong, he must still show prejudice. In this context, prejudice means a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Before reaching the merits, we must decide whether the record is sufficient to assess the adequacy and impact of trial counsel's performance.[10] We often preserve claims of ineffective assistance for postconviction proceedings to allow the parties to develop a complete record and allow counsel to respond. *State v. Truesdell*, 679 N.W.2d 611, 616 (Iowa 2004). Sadler believes the record is adequate to decide this claim on direct appeal. We agree.

### 1. Failure to object to jury instruction on dangerous weapons

Sadler argues trial counsel should have objected to the last sentence of this jury instruction:

> A "dangerous weapon" is any device or instrument designed primarily for use in inflicting death or injury, and when used in its designed manner is capable of inflicting death. It is also any sort of instrument or device actually used in such a way as to indicate the user intended to inflict death or serious injury, and when so used is capable of inflicting death. You are instructed that an automobile is, by law, a dangerous weapon.

---

[10] Effective July 1, 2019, Iowa Code section 814.7(1) states that an ineffective assistance of counsel claim "shall not be decided on appeal from the criminal proceedings." Because Sadler's conviction and sentence occurred before that date, we may address his claim on direct appeal.

Sadler points out that a vehicle is not a per se dangerous weapon under Iowa Code section 702.7.[11] And he contends he was prejudiced because the court also instructed the jurors that they could infer Sadler acted with malice aforethought based on his use of a dangerous weapon.

On the breach-of-duty question, we agree with Sadler. Granted, an automobile may be a dangerous weapon if used in a manner to indicate an intent to inflict death or serious injury. *See State v. Oldfather*, 306 N.W.2d 760, 763–64 (Iowa 1981). But that determination should have been left to the jury. Thus, the instruction misstated the law. By failing to recognize the flawed instruction, counsel's performance fell below professional norms.[12] *See State v. Hopkins*, 576 N.W.2d 374, 379–80 (Iowa 1998).

Yet that does not end our inquiry. The question remains whether counsel's omission caused Sadler prejudice. He argues counsel's inaction allowed the jury to automatically infer he acted with malice aforethought. That automatic inference,

---

[11] That section defines a dangerous weapon in three ways: 1) an instrument or device which is "designed primarily for use in inflicting death or injury upon a human being or animal, and which is capable of inflicting death upon a human being when used in the manner for which it was designed," (2) an instrument or device "which is actually used in such a manner as to indicate that the defendant intends to inflict death or serious injury upon the other, and which, when so used, is capable of inflicting death upon a human being," or (3) an instrument or device listed in the statute that has been defined as a dangerous weapon per se, one of which is "any portable device or weapon directing an electric current, impulse, wave, or beam that produces a high-voltage pulse designed to immobilize a person." Iowa Code § 702.7.

[12] We must evaluate counsel's representation without the benefit of retrospection. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.") But even when viewed in the heat of trial, we see no tactical reason for counsel not to object to the faulty instruction.

he contends, "substantially lessened the State's burden of proof on the malice aforethought element."

On the prejudice question, we disagree with Sadler. We cannot find that had counsel objected to the dangerous weapon instruction, a different outcome was reasonably probable. As described above, the State presented strong evidence that Sadler acted with malice aforethought—even without considering the dangerous-weapon inference.

This case is reminiscent of *State v. Lambert*, where the district court mistakenly instructed the jury that a metal pipe was a dangerous weapon as a matter of law. 612 N.W.2d 810, 815 (Iowa 2000). Lambert argued it was "incumbent upon his attorney to lodge an objection to its submission." *Id.* But the *Lambert* court found no prejudice in counsel's failure to object. "The evidence more than sufficiently proved the elements of the court's definition of 'dangerous weapon' as submitted to the jury." *Id.*

The same was true here. The evidence showed Sadler's actual use of the pickup conveyed his intent to inflict death or serious injury, and when he used the truck in that way, it could inflict death.[13] A dangerous weapon can "encompass almost any instrumentality under certain circumstances" depending on its actual use. *See State v. Greene*, 709 N.W.2d 535, 537 (Iowa 2006); *see also State v. Ortiz*, 789 N.W.2d 761, 767 (Iowa 2010); *State v. Durham*, 323 N.W.2d 243, 245

---

[13] Perhaps misunderstanding the upshot of the dangerous-weapon instruction, defense counsel argued in closing: "you are instructed the vehicle is the dangerous weapon. There are two ways to get there. If you have something like a gun or knife designed to kill or injure, that's by definition a dangerous weapon . Anything else can be a dangerous weapon if you use it in a way likely to cause injury."

(Iowa 1982). Sadler's truck met that definition. He angrily drove the flatbed upwards of 90 miles per hour on a gravel road at night and slammed squarely into the back of a smaller sports car. The impact caused devastating damage to the Mustang, which eventually caught fire. Used in that way, the pickup could inflict death, and in fact did so here.

Given this evidence we find no reasonable probability the trial result would have been different if counsel had objected to the dangerous weapon instruction. The *Strickland* standard for reversal has not been met.

### 2. Failure to request a specific-intent instruction

Next, Sadler claims his counsel breached an essential duty by failing to request an instruction that informed the jury that assault with a dangerous weapon required proof of specific intent. The court instructed the jury on both general and specific intent. But it did not specify which kind of intent applied to the assault charges. Sadler relies on *State v. Benson*, in which the defendant faced charges of child endangerment, a general-intent crime, as well as assault, a specific-intent crime. 919 N.W.2d 237, 244–45 (Iowa 2018). Benson requested an instruction explaining which form of intent applied to which offense. Because the district court rejected that request, our supreme court found the instructions were "confusing and misleading." *Id.* at 245.

The State distinguishes *Benson*, noting here the district court instructed the jury that second-degree murder did not require a finding of specific intent. So by process of elimination, according to the State, the jury could surmise that the specific-intent instruction applied to the assault charges. We are not sure that inference would have been plain to the jurors. To comply with *Benson*, counsel

should have asked the district court to provide the jury with "a marshaling instruction explaining which form of intent applied to which charge." *Id.* at 245.[14]

But even if counsel breached a duty in not anticipating the *Benson* holding, we find Sadler cannot show *Strickland* prejudice. The intent required by the assault statute "may be inferred from the circumstances of the transaction and the actions of the defendant." *See State v. Keeton*, 710 N.W.2d 531, 534 (Iowa 2006) (citation omitted). The State presented strong evidence that Sadler intentionally rammed the Mustang, knowing Ely was in the vehicle with other passengers. In his own testimony, Sadler admitted being upset and hoping to confront Ely's group. Given the totality of the record, no reasonable probability existed that had counsel objected and the court revised the instructions, the jury would have acquitted him on the assault counts.

### C. Failure to merge leaving-the-scene convictions

Sadler contends the district court should have merged his four convictions for failing to stop at the scene of the accident. *See State v. Sharkey*, No. 09-0068, 2010 WL 200355, at *2 (Iowa Ct. App. Jan. 22, 2010) (holding "driver cannot fail to stop multiple times and be charged with multiple violations of the statute"). The State agrees. We remand to the district court only to enter an order that merges those four counts into one conviction.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

[14] We note the supreme court issued *Benson* in October 2018, two months after the trial in this case. So counsel and the district court did not have the benefit of the *Benson* analysis when instructing Sadler's jury.